# JONES *v.* UNITED STATES

No. 97–9361.   Argued February 22, 1999—Decided June 21, 1999

374

THOMAS, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and III–B, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and KENNEDY, JJ., joined, and an opinion with respect to Part III–A, in which REHNQUIST, C. J., and O'CONNOR and KENNEDY, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which STEVENS and SOUTER, JJ., joined, and in which BREYER, J., joined as to Parts I, II, III, and V, *post*, p. 405.

*Timothy Crooks* argued the cause for petitioner. With him on the briefs was *Timothy W. Floyd.*

*Deputy Solicitor General Dreeben* argued the cause for the United States. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Robinson, Matthew D. Roberts,* and *Sean Connelly.**

JUSTICE THOMAS delivered the opinion of the Court, except as to Part III–A.†

Petitioner was sentenced to death for committing a kidnaping resulting in death to the victim. His sentence was imposed under the Federal Death Penalty Act of 1994, 18 U. S. C. § 3591 *et seq.* (1994 ed. and Supp. III). We are presented with three questions: whether petitioner was entitled to an instruction as to the effect of jury deadlock; whether there is a reasonable likelihood that the jury was led to believe that petitioner would receive a court-imposed sentence

---

*Kent S. Scheidegger* and *Charles L. Hobson* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging affirmance.

†JUSTICE SCALIA joins all but Part III–A of the opinion.

less than life imprisonment in the event that they could not reach a unanimous sentence recommendation; and whether the submission to the jury of two allegedly duplicative, vague, and overbroad nonstatutory aggravating factors was harmless error. We answer "no" to the first two questions. As for the third, we are of the view that there was no error in allowing the jury to consider the challenged factors. Assuming error, *arguendo*, we think it clear that such error was harmless.

## I

Petitioner Louis Jones, Jr., kidnaped Private Tracie Joy McBride at gunpoint from the Goodfellow Air Force Base in San Angelo, Texas. He brought her to his house and sexually assaulted her. Soon thereafter, petitioner drove Private McBride to a bridge just outside of San Angelo, where he repeatedly struck her in the head with a tire iron until she died. Petitioner administered blows of such severe force that, when the victim's body was found, the medical examiners observed that large pieces of her skull had been driven into her cranial cavity or were missing.

The Government charged petitioner with, *inter alia*, kidnaping with death resulting to the victim, in violation of 18 U. S. C. § 1201(a)(2), an offense punishable by life imprisonment or death. Exercising its discretion under the Federal Death Penalty Act of 1994, 18 U. S. C. § 3591 *et seq.*, the Government decided to seek the latter sentencing option. Petitioner was tried in the District Court for the Northern District of Texas and found guilty by the jury.

The District Court then conducted a separate sentencing hearing pursuant to § 3593. As an initial matter, the sentencing jury was required to find that petitioner had the requisite intent, see § 3591(a)(2); it concluded that petitioner intentionally killed his victim and intentionally inflicted serious bodily injury resulting in her death. Even on a finding of intent, however, a defendant is not death eligible unless the sentencing jury also finds that the Government

has proved beyond a reasonable doubt at least one of the statutory aggravating factors set forth at §3592. See §3593(e). Because petitioner was charged with committing a homicide, the Government had to prove 1 of the 16 statutory aggravating factors set forth at 18 U. S. C. §3592(c) (1994 ed. and Supp. III) (different statutory aggravating factors for other crimes punishable by death are set forth at §§3592(b), (d)). The jury unanimously found that two such factors had been proved beyond a reasonable doubt—it agreed that petitioner caused the death of his victim during the commission of another crime, see §3592(c)(1), and that he committed the offense in an especially heinous, cruel, and depraved manner, see §3592(c)(6).[1]

Once petitioner became death eligible, the jury had to decide whether he should receive a death sentence. In making the selection decision, the Act requires that the sentencing jury consider all of the aggravating and mitigating factors and determine whether the former outweigh the latter (or, if there are no mitigating factors, whether the aggravating factors alone are sufficient to warrant a death sentence). §§3591(a), 3592, 3593(e). The Act, however, requires more exacting proof of aggravating factors than mitigating ones— although a jury must unanimously agree that the Government established the existence of an aggravating factor beyond a reasonable doubt, §3593(c), the jury may consider a mitigating factor in its weighing process so long as one juror finds that the defendant established its existence by preponderance of the evidence, §§3593(c), (d). In addition to the

---

[1] As phrased on the Special Findings Form returned by the jury, the statutory aggravating factors read:

"2(A). The defendant LOUIS JONES caused the death of Tracie Joy McBride, or injury resulting in the death of Tracie Joy McBride, which occurred during the commission of the offense of Kidnapping."

"2(C). The defendant LOUIS JONES committed the offense in an especially heinous, cruel, and depraved manner in that it involved torture or serious physical abuse to Tracie Joy McBride." App. 51–52.

two statutory aggravators that established petitioner's death eligibility, the jury also unanimously found two aggravators of the nonstatutory variety[2] had been proved: One set forth victim impact evidence and the other victim vulnerability evidence.[3]   As for mitigating factors, at least one juror found 10 of the 11 that petitioner proposed and seven jurors wrote in a factor petitioner had not raised on the Special Findings Form.[4]

---

[2] The term "nonstatutory aggravating factor" is used to refer to any aggravating factor that is not specifically described in 18 U. S. C. § 3592. Section 3592(c) provides that the jury may consider "whether any other aggravating factor for which notice has been given exists."   Pursuant to § 3593(a), when the Government decides to seek the death penalty, it must provide notice of the aggravating factors that it proposes to prove as justifying a sentence of death.

[3] As phrased on the Special Findings Form, the nonstatutory aggravating factors read:

"3(B). Tracie Joy McBride's young age, her slight stature, her background, and her unfamiliarity with San Angelo, Texas.

"3(C). Tracie Joy McBride's personal characteristics and the effect of the instant offense on Tracie Joy McBride's family constitute an aggravating factor of the offense."   App. 53.

[4] The mitigating factors that the jury found as set forth on the Special Findings Form (along with the number of jurors that found for each factor in brackets) are as follows:

"1. That the defendant Louis Jones did not have a significant prior criminal record." [6]

"2. That the defendant Louis Jones' capacity to appreciate the wrongfulness of the defendant's conduct or to conform to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge." [2]

"3. That the defendant Louis Jones committed the offense under severe mental or emotional disturbance." [1]

"4. That the defendant Louis Jones was subjected to physical, sexual, and emotional abuse as a child (and was deprived of sufficient parental protection that he needed)." [4]

"5. That the defendant Louis Jones served his country well in Desert Storm, Grenada, and for 22 years in the United States Army." [8]

"6. That the defendant Louis Jones is likely to be a well-behaved inmate." [3]

After weighing the aggravating and mitigating factors, the jury unanimously recommended that petitioner be sentenced to death. App. 57–58. The District Court imposed sentence in accordance with the jury's recommendation pursuant to § 3594. The United States Court of Appeals for the Fifth Circuit affirmed the sentence. 132 F. 3d 232 (1998). We granted certiorari, 525 U. S. 809 (1998), and now affirm.

## II

### A

We first decide the question whether petitioner was entitled to an instruction as to the consequences of jury deadlock. Petitioner requested, in relevant part, the following instruction:

> "In the event, after due deliberation and reflection, the jury is unable to agree on a unanimous decision as to the sentence to be imposed, you should so advise me and I will impose a sentence of life imprisonment without possibility of release. . . .
>
> "In the event you are unable to agree on [a sentence of] Life Without Possibility of Release or Death, but you are unanimous that the sentence should not be less than Life Without Possibility of Release, you should report that vote to the Court and the Court will sentence the defendant to Life Without the Possibility of Release." App. 14–15.

---

"7. That the defendant Louis Jones is remorseful for the crime he committed." [4]

"8. That the defendant Louis Jones' daughter will be harmed by the emotional trauma of her father's execution." [9]

"9. That the defendant Louis Jones was under unusual and substantial internally generated duress and stress at the time of the offense." [3]

"10. That the defendant Louis Jones suffered from numerous neurological or psychological disorders at the time of the offense." [1] Id., at 54–56.

Seven jurors added petitioner's ex-wife as a mitigating factor without further elaboration. Id., at 56.

In petitioner's view, the Eighth Amendment requires that the jurors be instructed as to the effect of their inability to agree. He alternatively argues that we should invoke our supervisory power over the federal courts and require that such an instruction be given.

Before we turn to petitioner's Eighth Amendment argument, a question of statutory interpretation calls for our attention. The Fifth Circuit held that the District Court did not err in refusing petitioner's requested instruction because it was not substantively correct. See 132 F. 3d, at 242–243. According to the Court of Appeals, § 3593(b)(2)(C), which provides that a new jury shall be impaneled for a new sentencing hearing if the guilt phase jury is discharged for "good cause," requires the District Court to impanel a second jury and hold a second sentencing hearing in the event of jury deadlock. *Id.*, at 243. The Government interprets the statute the same way (although its reading is more nuanced) and urges that the judgment below be affirmed on this ground.

Petitioner, however, reads the Act differently. In his view, whenever the jury reaches a result other than a unanimous verdict recommending a death sentence or life imprisonment without the possibility of release, the duty of sentencing falls upon the district court pursuant to § 3594, which reads:

> "Upon a recommendation under section 3593(e) that the defendant should be sentenced to death or life imprisonment without possibility of release, the court shall sentence the defendant accordingly. Otherwise, the court shall impose any lesser sentence that is authorized by law. Notwithstanding any other law, if the maximum term of imprisonment for the offense is life imprisonment, the court may impose a sentence of life imprisonment without possibility of release."

Petitioner's argument is based on his construction of the term "[o]therwise." He argues that this term means that when the jury, after retiring for deliberations, reports itself as unable to reach a unanimous verdict, the sentencing determination passes to the court.

As the dissent also concludes, *post*, at 417–418, petitioner's view of the statute is the better one. The phrase "good cause" in § 3593(b)(2)(C) plainly encompasses events such as juror disqualification, but cannot be read so expansively as to include the jury's failure to reach a unanimous decision. Nevertheless, the Eighth Amendment does not require that the jurors be instructed as to the consequences of their failure to agree.

To be sure, we have said that the Eighth Amendment requires that a sentence of death not be imposed arbitrarily. See, *e. g., Buchanan* v. *Angelone*, 522 U. S. 269, 275 (1998). In order for a capital sentencing scheme to pass constitutional muster, it must perform a narrowing function with respect to the class of persons eligible for the death penalty and must also ensure that capital sentencing decisions rest upon an individualized inquiry. *Ibid.* The instruction that petitioner requested has no bearing on what we have called the "eligibility phase" of the capital sentencing process. As for what we have called the "selection phase," our cases have held that in order to satisfy the requirement that capital sentencing decisions rest upon an individualized inquiry, a scheme must allow a "broad inquiry" into all "constitutionally relevant mitigating evidence." *Id.,* at 276. Petitioner does not argue, nor could he, that the District Court's failure to give the requested instruction prevented the jury from considering such evidence.

In theory, the District Court's failure to instruct the jury as to the consequences of deadlock could give rise to an Eighth Amendment problem of a different sort: We also have held that a jury cannot be "affirmatively misled regarding its

role in the sentencing process." *Romano* v. *Oklahoma,* 512 U. S. 1, 9 (1994). In no way, however, was the jury affirmatively misled by the District Court's refusal to give petitioner's proposed instruction. The truth of the matter is that the proposed instruction has no bearing on the jury's role in the sentencing process. Rather, it speaks to what happens in the event that the jury is unable to fulfill its role—when deliberations break down and the jury is unable to produce a unanimous sentence recommendation. Petitioner's argument, although less than clear, appears to be that a death sentence is arbitrary within the meaning of the Eighth Amendment if the jury is not given any bit of information that might possibly influence an individual juror's voting behavior. That contention has no merit. We have never suggested, for example, that the Eighth Amendment requires a jury be instructed as to the consequences of a breakdown in the deliberative process. On the contrary, we have long been of the view that "[t]he very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." *Allen* v. *United States,* 164 U. S. 492, 501 (1896).[5] We further have recognized that in a capital sentencing proceeding, the Government has "a strong interest in having the jury express the conscience of the community on the ultimate question of life or death." *Lowenfield* v. *Phelps,* 484 U. S. 231, 238 (1988) (citation and internal quotation marks omitted). We are of the view that a charge to the jury of the sort proposed by petitioner might well have the effect of undermining this strong governmental interest.[6]

---

[5] We have thus approved of the use of a supplemental charge to encourage a jury reporting itself as deadlocked to engage in further deliberations, see *Allen* v. *United States,* 164 U. S., at 501, even capital sentencing juries, see *Lowenfield* v. *Phelps,* 484 U. S. 231, 237–241 (1988).

[6] It is not insignificant that the Courts of Appeals to have addressed this question, as far as we are aware, are uniform in rejecting the argument that the Constitution requires an instruction as to the consequences of a jury's inability to agree. See, *e. g., Coe* v. *Bell,* 161 F. 3d 320, 339–340

We similarly decline to exercise our supervisory powers to require that an instruction on the consequences of deadlock be given in every capital case. In drafting the Act, Congress chose not to require such an instruction. Cf. § 3593(f) (district court "shall instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be"). Petitioner does point us to a decision from the New Jersey Supreme Court requiring, in an exercise of that court's supervisory authority, that the jury be informed of the sentencing consequences of nonunanimity. See *New Jersey* v. *Ramseur*, 106 N. J. 123, 304–315, 524 A. 2d 188, 280–286 (1987). Of course, New Jersey's practice has no more relevance to our decision than the power to persuade. Several other States have declined to require a similar instruction. See, *e. g.*, *North Carolina* v. *McCarver*, 341 N. C. 364, 394, 462 S. E. 2d 25, 42 (1995); *Brogie* v. *Oklahoma*, 695 P. 2d 538, 547 (Okla. Crim. App. 1985); *Calhoun* v. *Maryland*, 297 Md. 563, 593–595, 468 A. 2d 45, 58–60 (1983); *Coulter* v. *Alabama*, 438 So. 2d 336, 346 (Ala. Crim. App. 1982); *Justus* v. *Virginia*, 220 Va. 971, 979, 266 S. E. 2d 87, 92–93 (1980). We find the reasoning of the Virginia Supreme Court in *Justus* far more persuasive than that of the New Jersey Supreme Court, especially in light of the strong governmental interest that we have recognized in having the jury render a unanimous sentence recommendation:

---

(CA6 1998); *Green* v. *French*, 143 F. 3d 865, 890 (CA4 1998); *United States* v. *Chandler*, 996 F. 2d 1073, 1088–1089 (CA11 1993); *Evans* v. *Thompson*, 881 F. 2d 117, 123–124 (CA4 1989). Indeed, the Fifth Circuit, in the alternative, reached the same conclusion in this very case. See 132 F. 3d 232, 245 (1998).

"The court properly refused an instruction offered by the defendant which would have told the jury that if it could not reach agreement as to the appropriate punishment, the court would dismiss it and impose a life sentence. While this was a correct statement of law it concerned a procedural matter and was not one which should have been the subject of an instruction. It would have been an open invitation for the jury to avoid its responsibility and to disagree." *Id.*, at 979, 266 S. E. 2d, at 92.

In light of the legitimate reasons for not instructing the jury as to the consequences of deadlock, and in light of congressional silence, we will not exercise our supervisory powers to require that an instruction of the sort petitioner sought be given in every case. Cf. *Shannon* v. *United States*, 512 U. S. 573, 587 (1994).

B

Petitioner further argues that the jury was led to believe that if it could not reach a unanimous sentence recommendation he would receive a judge-imposed sentence less severe than life imprisonment, and his proposed instruction as to the consequences of deadlock was necessary to correct the jury's erroneous impression. Moreover, he contends that the alleged confusion independently warrants reversal of his sentence under the Due Process Clause, the Eighth Amendment, and the Act itself. He grounds his due process claim in the assertion that sentences may not be based on materially untrue assumptions, his Eighth Amendment claim in his contention that the jury is entitled to accurate sentencing information, and his statutory claim in an argument that jury confusion over the available sentencing options constitutes an "arbitrary factor" under § 3595(c)(2)(A).

To put petitioner's claim in the proper context, we must briefly review the jury instructions and sentencing proce-

dures used at trial.   After instructing the jury on the aggra-
vating and mitigating factors and explaining the process
of weighing those factors, the District Court gave the fol-
lowing instructions pertaining to the jury's sentencing
recommendation:

> "Based upon this consideration, you the jury, by unani-
> mous vote, shall recommend whether the defendant
> should be sentenced to death, sentenced to life imprison-
> ment without the possibility of release, or sentenced to
> some other lesser sentence.
>
> "If you unanimously conclude that the aggravating
> factors found to exist sufficiently outweigh any mitigat-
> ing factor or factors found to exist, or in the absence of
> any mitigating factors, that the aggravating factors are
> themselves sufficient to justify a sentence of death, you
> may recommend a sentence of death.   Keep in mind,
> however, that regardless of your findings with respect
> to aggravating and mitigating factors, you are never
> required to recommend a death sentence.
>
> "If you recommend the imposition of a death sentence,
> the court is required to impose that sentence.   If you
> recommend a sentence of life without the possibility of
> release, the court is required to impose that sentence.
> If you recommend that some other lesser sentence be
> imposed, the court is required to impose a sentence that
> is authorized by the law.   In deciding what recommen-
> dation to make, you are not to be concerned with the
> question of what sentence the defendant might receive
> in the event you determine not to recommend a death
> sentence or a sentence of life without the possibility of
> release.   That is a matter for the court to decide in
> the event you conclude that a sentence of death or life
> without the possibility of release should not be recom-
> mended."   App. 43–44.

The District Court also provided the jury with four decision forms on which to record its recommendation.[7]   In its instructions explaining those forms, the District Court told the jury that its choice of form depended on its recommendation:

"The forms are self-explanatory: Decision Form A should be used if you determine that a sentence of death should not be imposed because the government failed to prove beyond a reasonable doubt the existence of the required intent on the part of the defendant or a required aggravating factor.   Decision Form B should be used if you unanimously recommend that a sentence of death should be imposed.   Decision Form C or Decision Form D should be used if you determine that a sentence of death should not be imposed because: (1) you do not unanimously find that the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist; (2) you do not unanimously find that the aggravating factor or factors found to exist are

---

[7] The decision forms read as follows:
"DECISION FORM A
"We the jury have determined that a sentence of death should not be imposed because the government has failed to prove beyond a reasonable doubt the existence of the required intent on the part of the defendant or a required aggravating factor."
"DECISION FORM B
"Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that a sentence of death be imposed."
"DECISION FORM C
"We the jury recommend, by unanimous verdict, a sentence of life imprisonment without the possibility of release."
"DECISION FORM D
"We the jury recommend some other lesser sentence."   App. 57–59.

themselves sufficient to justify a sentence of death where no mitigating factor has been found to exist; or (3) regardless of your findings with respect to aggravating and mitigating factors you are not unanimous in recommending that a sentence of death should be imposed. Decision Form C should be used if you unanimously recommend that a sentence of imprisonment for life without the possibility of release should be imposed.

"Decision Form D should be used if you recommend that some other lesser sentence should be imposed." *Id.*, at 47–48.

Petitioner maintains that the instructions in combination with the decision forms led the jury to believe that if it failed to recommend unanimously a sentence of death or life imprisonment without the possibility of release, then it would be required to use Decision Form D and the court would impose a sentence less than life imprisonment.[8] The scope of our review is shaped by whether petitioner properly raised and preserved an objection to the instructions at trial. A party generally may not assign error to a jury instruction if he fails to object before the jury retires or to "stat[e] distinctly the matter to which that party objects and the grounds of the objection." Fed. Rule Crim. Proc. 30. These timeliness and specificity requirements apply during the sentencing phase as well as the trial. See 18 U. S. C. § 3595(c)(2)(C); see also Fed. Rules Crim. Proc. 1, 54(a). They enable a trial court to correct any instructional mis-

-----

[8] Petitioner does not argue that the District Court's instructions on the lesser sentence option, standing alone, constituted reversible error although the parties agree that, after the jury found petitioner guilty of kidnaping resulting in death, the only possible sentences were death and a life sentence. See Brief for Petitioner 18–19; Brief for United States 13, n. 2; see also 18 U. S. C. § 1201. Petitioner made such an argument below; the Fifth Circuit, however, concluded that the instructions as to the lesser sentence option did not rise to the level of plain error. 132 F. 3d, at 246–248.

takes before the jury retires and in that way help to avoid the burdens of an unnecessary retrial. While an objection in a directed verdict motion before the jury retires can preserve a claim of error, *Leary* v. *United States,* 395 U. S. 6, 32 (1969), objections raised after the jury has completed its deliberations do not. See *Singer* v. *United States,* 380 U. S. 24, 38 (1965); *Lopez* v. *United States,* 373 U. S. 427, 436 (1963); cf. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 238–239 (1940). Nor does a request for an instruction before the jury retires preserve an objection to the instruction actually given by the court. Otherwise, district judges would have to speculate on what sorts of objections might be implied through a request for an instruction and issue rulings on "implied" objections that a defendant never intends to raise. Such a rule would contradict Rule 30's mandate that a party state distinctly his grounds for objection.

Petitioner did not voice the objections to the instructions and decision forms that he now raises before the jury retired. See App. 16–33. While Rule 30 could be read literally to bar any review of petitioner's claim of error, our decisions instead have held that an appellate court may conduct a limited review for plain error. Fed. Rule Crim. Proc. 52(b); *Johnson* v. *United States,* 520 U. S. 461, 465–466 (1997); *United States* v. *Olano,* 507 U. S. 725, 731–732 (1993); *Lopez, supra,* at 436–437; *Namet* v. *United States,* 373 U. S. 179, 190–191 (1963). Petitioner, however, contends that the Federal Death Penalty Act creates an exception. He relies on language in the Act providing that an appellate court shall remand a case where it finds that "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." § 3595(c)(2)(A). According to petitioner, the alleged jury confusion over the available sentencing options is an arbitrary factor and thus warrants resentencing even if he did not properly preserve the objection.

This argument rests on an untenable reading of the Act. The statute does not explicitly announce an exception to

plain-error review, and a congressional intent to create such an exception cannot be inferred from the overall scheme. Statutory language must be read in context and a phrase "gathers meaning from the words around it." *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307 (1961); see also *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 575 (1995). Here, the same subsection that petitioner relies upon further provides that reversal is warranted where "the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure." § 3595(c)(2)(C). This language makes clear that Congress sought to impose a timely objection requirement at sentencing and did not intend to equate the phrase "arbitrary factor" with legal error. Petitioner's broad interpretation of § 3595(c)(2)(A) would drain § 3595(c)(2)(C) of any independent meaning.

We review the instructions, then, for plain error. Under that review, relief is not warranted unless there has been (1) error, (2) that is plain, and (3) affects substantial rights. *Johnson, supra,* at 467; *Olano, supra,* at 732. Appellate review under the plain-error doctrine, of course, is circumscribed and we exercise our power under Rule 52(b) sparingly. See *United States* v. *Young,* 470 U. S. 1, 15 (1985); *United States* v. *Frady,* 456 U. S. 152, 163, and n. 14 (1982); cf. *Henderson* v. *Kibbe,* 431 U. S. 145, 154 (1977) ("It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court"). An appellate court should exercise its discretion to correct plain error only if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Olano, supra,* at 732 (internal quotation marks omitted); *Young, supra,* at 15; *United States* v. *Atkinson,* 297 U. S. 157, 160 (1936).

Petitioner's argument—which depends on the premise that the instructions and decision forms led the jury to believe that it did not have to recommend unanimously a lesser

sentence—falls short of satisfying even the first requirement of the plain-error doctrine, for we cannot see that any error occurred. We have considered similar claims that allegedly ambiguous instructions caused jury confusion. See, *e. g.*, *Victor* v. *Nebraska*, 511 U. S. 1 (1994); *Estelle* v. *McGuire*, 502 U. S. 62 (1991); *Boyde* v. *California*, 494 U. S. 370 (1990). The proper standard for reviewing such claims is " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle, supra,* at 72 (quoting *Boyde, supra,* at 380); see also *Victor, supra,* at 6 (applying reasonable likelihood standard to direct review of state criminal conviction).[9]

There is no reasonable likelihood that the jury applied the instructions incorrectly. The District Court did not expressly inform the jury that it would impose a lesser sentence in case of deadlock. It simply told the jury that, if it recommended a lesser sentence, the court would impose a sentence "authorized by the law." App. 44. Nor did the District Court expressly require the jury to select Decision Form D if it could not reach agreement. Instead, it exhorted the jury "to discuss the issue of punishment with one

---

[9] Petitioner concedes that the *Boyde* standard applies to the extent that he is advancing a constitutional claim, but relying on our prior decision in *Andres* v. *United States*, 333 U. S. 740, 752 (1948), he contends that a more lenient standard applies to the extent that he seeks relief under the statute directly. Our decisions in *Boyde* and *Estelle*, however, foreclose that reading of *Andres*. In *Boyde* we noted that our prior decisions, including *Andres*, had been "less than clear" in articulating a single workable standard for evaluating claims that an instruction prevented the jury's consideration of constitutionally relevant evidence. 494 U. S., at 378. In order to supply "a single formulation for this Court and other courts to employ in deciding this kind of federal question," we announced the "reasonable likelihood" standard. *Id.*, at 379. We made this same point later in *Estelle*, noting that "[i]n *Boyde* . . . we made it a point to settle on a single standard of review for jury instructions—the 'reasonable likelihood' standard—after considering the many different phrasings that had previously been used by this Court." 502 U. S., at 72–73, n. 4.

another in an effort to reach agreement, if you can do so." *Id.*, at 46.

Notwithstanding the absence of an explicit instruction on the consequences of nonunanimity, petitioner identifies several passages which, he believes, support the inference that the jury was confused on this point. He trains on that portion of the instructions telling the jurors that the court would decide the sentence if they did not recommend a sentence of death or life without the possibility of release. Petitioner argues that this statement, coupled with two earlier references to a "lesser sentence" option, caused the jurors to infer that the District Court would impose a lesser sentence if they could not unanimously agree on a sentence of death or life without the possibility of release. He maintains that this inference is strengthened by a later instruction: "In order to bring back a verdict recommending the punishment of death or life without the possibility of release, all twelve of you must unanimously vote in favor of such specific penalty." *Id.*, at 45. According to petitioner, the failure to mention the "lesser sentence" option in this statement strongly implied that, in contradistinction to the first two options, the "lesser sentence" option did not require jury unanimity.

Petitioner parses these passages too finely. Our decisions repeatedly have cautioned that instructions must be evaluated not in isolation but in the context of the entire charge. See, *e. g.*, *Bryan* v. *United States*, 524 U. S. 184, 199 (1998); *United States* v. *Park*, 421 U. S. 658, 674 (1975); *Cupp* v. *Naughten*, 414 U. S. 141, 147 (1973); *Boyd* v. *United States*, 271 U. S. 104, 107 (1926). We agree with the Fifth Circuit that when these passages are viewed in the context of the entire instructions, they lack ambiguity and cannot be given the reading that petitioner advances. See 132 F. 3d, at 244. We previously have held that instructions that might be ambiguous in the abstract can be cured when read in conjunction with other instructions. *Bryan, supra,* at 199; *Victor,*

*supra,* at 14–15; *Estelle, supra,* at 74–75. Petitioner's claim is far weaker than those we evaluated in *Bryan, Victor,* and *Estelle* because the jury in this case received an explicit instruction that it had to be unanimous. Just prior to its admonition that the jury should not concern itself with the ultimate sentence if it does not recommend death or life without the possibility of release, the trial court expressly instructed the jury in unambiguous language that any sentencing recommendation had to be by a unanimous vote. Specifically, it stated that "you the jury, by unanimous vote, shall recommend whether the defendant should be sentenced to death, sentenced to life imprisonment without the possibility of release, or sentenced to some other lesser sentence." App. 43. Other instructions, by contrast, specified when the jury did not have to act unanimously. For example, the District Court explicitly told the jury that its findings on the mitigating circumstances, unlike those on the aggravating circumstances, did not have to be unanimous.[10] To be sure, the District Court could have used the phrase "unanimously" more frequently. But when read alongside an unambiguous charge that any sentencing recommendation be unanimous and other instructions explicitly identifying when the jury need not be unanimous, the passages identified by petitioner do not create a reasonable likelihood that the jury believed that deadlock would cause the District Court to impose a lesser sentence.

---

[10] The relevant portion of the instruction read: "You will also recall that I previously told you that all twelve of you had to unanimously agree that a particular aggravating circumstance was proved beyond a reasonable doubt before you consider it. Quite the opposite is true with regard to mitigating factors. A finding with respect to a mitigating factor may be made by any one or more of the members of the jury, and any member who finds by a preponderance of the evidence the existence of a mitigating factor may consider such factor established for his or her weighing of aggravating and mitigating factors regardless of the number of other jurors who agree that such mitigating factor has been established." App. 43.

Petitioner also relies on alleged ambiguities in the decision forms and the explanatory instructions. He stresses the fact that Decision Form D (lesser sentence recommendation), unlike Decision Forms B (death sentence) and C (life without the possibility of release), did not contain the phrase "by unanimous vote" and required only the foreperson's signature. These features of Decision Form D, according to petitioner, led the jury to conclude that nonunanimity would result in a lesser sentence. According to petitioner, the instructions accompanying Decision Form D, unlike those respecting Decision Forms B and C, did not mention unanimity, thereby increasing the likelihood of confusion.

With respect to this aspect of petitioner's argument, we agree with the Fifth Circuit that "[a]lthough the verdict forms standing alone could have persuaded a jury to conclude that unanimity was not required for the lesser sentence option, any confusion created by the verdict forms was clarified when considered in light of the entire jury instruction." 132 F. 3d, at 245. The District Court's explicit instruction that the jury had to be unanimous and its exhortation to the jury to discuss the punishment and attempt to reach agreement, App. 46, make it doubtful that the jury thought it was compelled to employ Decision Form D in the event of disagreement.

Petitioner also places too much weight on the fact that Decision Form D required only the foreperson's signature. Although it only contained a space for the foreperson's signature, Form D, like the others, used the phrase "We the jury recommend . . . ," thereby signaling that Form D represented the jury's recommendation. *Id.*, at 59. Moreover, elsewhere, the jury foreperson alone signed the jury forms to indicate the jury's unanimous agreement. Specifically, only the jury foreperson signed the special findings form on which the jury was required to indicate its unanimous agreement that an aggravating factor had been proved beyond a reasonable doubt. *Id.*, at 51–53. In these circumstances, we do

not think that the decision forms or accompanying instructions created a reasonable likelihood of confusion over the effect of nonunanimity.[11]

Even assuming, *arguendo*, that an error occurred (and that it was plain), petitioner cannot show that it affected his substantial rights. Any confusion among the jurors over the effect of a lesser sentence recommendation was allayed by the District Court's admonition that the jury should not concern itself with the effect of such a recommendation. See *supra*, at 390 (quoting App. 44). The jurors are presumed to have followed these instructions. See *Shannon*, 512 U. S., at 585; *Richardson* v. *Marsh*, 481 U. S. 200, 206 (1987). Even if the jurors had some lingering doubts about the effect of deadlock, therefore, the instructions made clear that they should set aside their concerns and either report that they were unable to reach agreement or recommend a lesser sentence if they believed that this was the only option.

Moreover, even assuming that the jurors were confused over the consequences of deadlock, petitioner cannot show the confusion necessarily worked to his detriment. It is just as likely that the jurors, loath to recommend a lesser sentence, would have compromised on a sentence of life imprisonment as on a death sentence. Where the effect of an al-

---

[11] Petitioner also urges us to take cognizance of two affidavits prepared after the jury had returned its sentencing recommendation. One affidavit, attached to petitioner's new trial motion, was executed by an investigator for the federal public defender after a juror had contacted the public defender's office. *Id.*, at 66–68. The other affidavit, attached to petitioner's motion to reconsider the District Court's order denying his motion for a new trial, was executed by one of the jurors. *Id.*, at 78–80. The Fifth Circuit ruled that petitioner could not rely on these affidavits to undermine the jury's sentencing recommendation. 132 F. 3d, at 245–246. Petitioner did not raise this independent determination in any of his questions presented, and we do not believe that the issue is fairly included within them. We therefore decline review of this ruling by the Fifth Circuit. See this Court's Rule 14.1(a); *Berkemer* v. *McCarty*, 468 U. S. 420, 443, n. 38 (1984).

leged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights. Cf. *Romano*, 512 U. S., at 14. In *Romano*, we considered a similar argument, namely, that jurors had disregarded a trial judge's instructions and given undue weight to certain evidence. In rejecting that argument, we noted that, even assuming that the jury disregarded the trial judge's instructions, "[i]t seems equally plausible that the evidence could have made the jurors more inclined to impose a death sentence, or it could have made them less inclined to do so." *Ibid.* Any speculation on the effect of a lesser sentence recommendation, like the evidence in *Romano*, would have had such an indeterminate effect on the outcome of the proceeding that we cannot conclude that any alleged error in the District Court's instructions affected petitioner's substantial rights. See *Park*, 421 U. S., at 676; *Lopez*, 373 U. S., at 436–437.

## III

### A

Apart from the claimed instructional error, petitioner argues that the nonstatutory aggravating factors found and considered by the jury, see n. 2, *supra*, were vague, overbroad, and duplicative in violation of the Eighth Amendment, and that the District Court's error in allowing the jury to consider them was not harmless beyond a reasonable doubt.

The Eighth Amendment, as the Court of Appeals correctly recognized, see 132 F. 3d, at 250, permits capital sentencing juries to consider evidence relating to the victim's personal characteristics and the emotional impact of the murder on the victim's family in deciding whether an eligible defendant should receive a death sentence. See *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991) ("A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be im-

posed. There is no reason to treat such evidence differently than other relevant evidence is treated"). Petitioner does not dispute that, as a general matter, such evidence is appropriate for the sentencing jury's consideration. See Reply Brief for Petitioner 15. His objection is that the two nonstatutory aggravating factors were duplicative, vague, and overbroad so as to render their use in this case unconstitutional, a point with which the Fifth Circuit agreed, 132 F. 3d, at 250–251, although it ultimately ruled in the Government's favor on the ground that the alleged error was harmless beyond a reasonable doubt, id., at 251–252.

The Government here renews its argument that the nonstatutory aggravators in this case were constitutionally valid. At oral argument, however, it was suggested that this case comes to us on the assumption that the nonstatutory aggravating factors were invalid because the Government did not cross-appeal on the question. Tr. of Oral Arg. 25. As the prevailing party, the Government is entitled to defend the judgment on any ground that it properly raised below. See, e. g., El Paso Natural Gas Co. v. Neztsosie, 526 U. S. 473, 479 (1999); Northwest Airlines, Inc. v. County of Kent, 510 U. S. 355, 364 (1994) ("A prevailing party need not cross-petition to defend a judgment on any ground properly raised below, so long as that party seeks to preserve, and not to change, the judgment"). It further was suggested that because we granted certiorari on the Government's rephrasing of petitioner's questions and because the third question—"whether the court of appeals correctly held that the submission of invalid nonstatutory aggravating factors was harmless beyond a reasonable doubt"—presumes error, we must assume the nonstatutory aggravating factors were erroneous. Tr. of Oral Arg. 25–27. We are not convinced that the reformulated question presumes error. The question whether the nonstatutory aggravating factors were constitutional is fairly included within the third question pre-

sented—we might answer "no" to the question "[w]hether the Court of Appeals correctly held that the submission of invalid nonstatutory aggravating factors was harmless beyond a reasonable doubt," 525 U. S. 809 (1998), by explaining that the Fifth Circuit was incorrect in holding that there was error. Without a doubt, the Government would have done better to call our attention to the fact that it planned to argue that the nonstatutory aggravating factors were valid at the petitioning stage. But it did not affirmatively concede that the nonstatutory aggravators were invalid, see Brief in Opposition 18–22, and absent such a concession, we think that the Government's argument is properly presented.[12]

---

[12] The dissent would treat this aspect of the Government's argument as waived. *Post*, at 420–421, n. 24. As JUSTICE GINSBURG explained, for a unanimous Court, in *Caterpillar Inc.* v. *Lewis*, 519 U. S. 61 (1996): "Under this Court's Rule 15.2, a nonjurisdictional argument not raised in a respondent's brief in opposition to a petition for a writ of certiorari '*may* be deemed waived.'" *Id.*, at 75, n. 13 (emphasis added). But we have not done so when the issue not raised in the brief in opposition was "predicate to an intelligent resolution of the question presented." *Ohio* v. *Robinette*, 519 U. S. 33, 38 (1996) (internal quotation marks omitted); see also *Caterpillar*, 519 U. S., at 75, n. 13. In those instances, we have treated the issue not raised in opposition as fairly included within the question presented. This is certainly such a case. Assessing the error (including whether there was error at all) is essential to an intelligent resolution of whether any such error was harmless. Moreover, here, as in *Caterpillar*, "[t]he parties addressed the issue in their briefs and at oral argument." *Ibid.* By contrast, in the cases that the dissent looks to for support for its position, there were good reasons to decline to exercise our discretion. In *Roberts* v. *Galen of Va., Inc.*, 525 U. S. 249, 253–254 (1999) *(per curiam)*, the "claims [we declined to consider did] not appear to have been sufficiently developed below for us to assess them," and in *South Central Bell Telephone Co.* v. *Alabama*, 526 U. S. 160, 171 (1999), the argument respondent raised for the first time in its merits brief was "so far-reaching an argument" that "[w]e would normally expect notice [of it]," especially when, unlike this case, the respondent's argument did not appear to have been raised or considered below.

## 1

We first address petitioner's contention that the two non-statutory aggravating factors were impermissibly duplicative. The Fifth Circuit reasoned that "[t]he plain meaning of the term 'personal characteristics,' used in [nonstatutory aggravator] 3(C), necessarily includes 'young age, slight stature, background, and unfamiliarity,' which the jury was asked to consider in 3(B)." 132 F. 3d, at 250. The problem, the court thought, was that this duplication led to "double counting" of aggravating factors. Following a Tenth Circuit decision, *United States* v. *McCullah*, 76 F. 3d 1087, 1111 (1996), the Fifth Circuit was of the view that in a weighing scheme, "double counting" has a tendency to skew the process so as to give rise to the risk of an arbitrary, and thus unconstitutional, death sentence. 132 F. 3d, at 251. In the Fifth Circuit's words, there may be a thumb on the scale in favor of death "[i]f the jury has been asked to weigh the same aggravating factor twice." *Ibid.*

We have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the "double counting" theory that the Tenth Circuit advanced in *McCullah*[13] and the Fifth Circuit appears to have followed here. What we have said is that the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor. See *Stringer* v. *Black*, 503 U. S. 222, 232 (1992). Petitioner's argument (and the reasoning of the Fifth and Tenth Circuits) would have us reach a quite different proposition—that if two aggravating factors are "duplicative," then the weighing process necessarily is skewed, and the factors are therefore invalid.

Even accepting, for the sake of argument, petitioner's "double counting" theory, there are nevertheless several

---

[13] The Tenth Circuit, in a decision subsequent to *McCullah*, has emphasized that factors do not impermissibly overlap unless one "necessarily subsumes" the other. *Cooks* v. *Ward*, 165 F. 3d 1283, 1289 (1998).

problems with the Fifth Circuit's application of the theory in this case. The phrase "personal characteristics" as used in factor 3(C) does not obviously include the specific personal characteristics listed in 3(B)—"young age, her slight stature, her background, and her unfamiliarity with San Angelo"—especially in light of the fact that 3(C) went on to refer to the impact of the crime on the victim's family. In the context of considering the effect of the crime on the victim's family, it would be more natural to understand "personal characteristics" to refer to those aspects of the victim's character and personality that her family would miss the most. More important, to the extent that there was any ambiguity arising from how the factors were drafted, the Government's argument to the jury made clear that 3(B) and 3(C) went to entirely different areas of aggravation—the former clearly went to victim vulnerability while the latter captured the victim's individual uniqueness and the effect of the crime on her family. See, e. g., 25 Record 2733–2734 ("[Y]ou can consider [the victim's] young age, her slight stature, her background, her unfamiliarity with the San Angelo area. . . . She is barely five feet tall [and] weighs approximately 100 pounds. [She is] the ideal victim"); id., at 2734 ("[Y]ou can consider [the victim's] personal characteristics and the effects of the instant offense on her family. . . . You heard about this young woman, you heard about her from her mother, you heard about her from her friends that knew her. She was special, she was unique, she was loving, she was caring, she had a lot to offer this world"). As such, even if the phrase "personal characteristics" as used in factor 3(C) *was* understood to include the specific personal characteristics listed in 3(B), the factors as a whole were not duplicative—at best, certain evidence was relevant to two different aggravating factors. Moreover, any risk that the weighing process would be skewed was eliminated by the District Court's instruction that the jury "should not simply count the number of aggravating and mitigating factors and reach a deci-

sion based on which number is greater [but rather] should consider the weight and value of each factor." App. 45.

## 2

We also are of the view that the Fifth Circuit incorrectly concluded that factors 3(B) and 3(C) were unconstitutionally vague. In that court's view, the nonstatutory aggravating factors challenged here "fail[ed] to guide the jury's discretion, or [to] distinguish this murder from any other murder." 132 F. 3d, at 251. The Court of Appeals, relying on our decision in *Maynard* v. *Cartwright*, 486 U. S. 356, 361–362 (1988), also was of the opinion that "[t]he use of the terms 'background,' 'personal characteristics,' and 'unfamiliarity' without further definition or instruction left the jury with . . . open-ended discretion." 132 F. 3d, at 251 (internal quotation marks omitted).

Ensuring that a sentence of death is not so infected with bias or caprice is our "controlling objective when we examine eligibility and selection factors for vagueness." *Tuilaepa* v. *California*, 512 U. S. 967, 973 (1994). Our vagueness review, however, is "quite deferential." *Ibid.* As long as an aggravating factor has a core meaning that criminal juries should be capable of understanding, it will pass constitutional muster. *Ibid.* Assessed under this deferential standard, the factors challenged here surely are not vague. The jury should have had no difficulty understanding that factor 3(B) was designed to ask it to consider whether the victim was especially vulnerable to petitioner's attack. Nor should it have had difficulty comprehending that factor 3(C) asked it to consider the victim's personal traits and the effect of the crime on her family.[14] Even if the factors as written

---

[14] Petitioner argues that the term "personal characteristics" was so vague that the jury may have thought it could consider the victim's race and the petitioner's race under factor 3(C). In light of the remainder of the factor and the Government's argument with respect to the factor, we fail to see that possibility. In any event, in accordance with the Death

were somewhat vague, the Fifth Circuit was wrong to conclude that the factors were not given further definition, see 132 F. 3d, at 251; as we have explained, the Government's argument made absolutely clear what each nonstatutory factor meant.[15]

### 3

Finally, we turn to petitioner's contention that the challenged nonstatutory factors were overbroad. An aggravating factor can be overbroad if the sentencing jury "fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty." *Arave* v. *Creech*, 507 U. S. 463, 474 (1993). We have not, however, specifically considered what it means for a factor to be overbroad when it is important only for selection purposes and especially when it sets forth victim vulnerability or victim impact evidence. Of course, every murder will have an impact on the victim's family and friends and victims are often chosen because of their vulnerability. It might seem, then, that the factors 3(B) and 3(C) apply to every eligible defendant and thus fall within the Eighth Amendment's proscription against overbroad factors. But that cannot be correct; if it were, we would not have decided *Payne* as we did. Even though the *concepts* of victim impact and victim vulnerability may well be relevant in every case, *evidence* of victim vulnerability and victim impact in a particular case is inherently individualized. And such evidence is surely relevant to the selection phase decision, given that the sentencer

Penalty Act's explicit command in §3593(f), the District Court instructed the jury not to consider race at all in reaching its decision. App. 47. Jurors are presumed to have followed their instructions. See *Richardson* v. *Marsh*, 481 U. S. 200, 206 (1987).

[15] We reiterate the point we made in *Tuilaepa* v. *California*, 512 U. S. 967 (1994)—we have held only a few, quite similar factors vague, see, *e. g.*, *Maynard* v. *Cartwright*, 486 U. S. 356 (1988) (whether murder was "especially heinous, atrocious, or cruel"), while upholding numerous other factors against vagueness challenges, see 512 U. S., at 974 (collecting cases).

should consider all of the circumstances of the crime in deciding whether to impose the death penalty. See *Tuilaepa*, 512 U. S., at 976.

What is of common importance at the eligibility and selection stages is that "the process is neutral and principled so as to guard against bias or caprice in the sentencing decision." *Id.*, at 973. So long as victim vulnerability and victim impact factors are used to direct the jury to the individual circumstances of the case, we do not think that principle will be disturbed. Because factors 3(B) and 3(C) directed the jury to the evidence specific to this case, we do not think that they were overbroad in a way that offended the Constitution.

### B

The error in this case, if any, rests in loose drafting of the nonstatutory aggravating factors; as we have made clear, victim vulnerability and victim impact evidence are appropriate subjects for the capital sentencer's consideration. Assuming that use of these loosely drafted factors was indeed error, we conclude that the error was harmless.

Harmless-error review of a death sentence may be performed in at least two different ways. An appellate court may choose to consider whether absent an invalid factor, the jury would have reached the same verdict or it may choose instead to consider whether the result would have been the same had the invalid aggravating factor been precisely defined. See *Clemons* v. *Mississippi*, 494 U. S. 738, 753–754 (1990). The Fifth Circuit chose to perform the first sort of analysis, and ultimately concluded that the jury would have returned a recommendation of death even had it not considered the two supposedly invalid nonstatutory aggravating factors:

"After removing the offensive non-statutory aggravating factors from the balance, we are left with two

statutory aggravating factors and eleven mitigating factors to consider when deciding whether, beyond a reasonable doubt, the death sentence would have been imposed had the invalid aggravating factors never been submitted to the jury. At the sentencing hearing, the government placed great emphasis on the two statutory aggravating factors found unanimously by the jury—Jones caused the death of the victim during the commission of the offense of kidnapping; and the offense was committed in an especially heinous, cruel, and depraved manner in that it involved torture or serious physical abuse of the victim. Under part two of the Special Findings Form, if the jury had failed to find that the government proved at least one of the statutory aggravating factors beyond a reasonable doubt, then the deliberations would have ceased leaving the jury powerless to recommend the death penalty. Therefore, the ability of the jury to recommend the death penalty hinged on a finding of a least one statutory aggravating factor. Conversely, jury findings regarding the non-statutory aggravating factors were not required before the jury could recommend the death penalty. After removing the two non-statutory aggravating factors from the mix, we conclude that the two remaining statutory aggravating factors unanimously found by the jury support the sentence of death, even after considering the eleven mitigating factors found by one or more jurors. Consequently, the error was harmless because the death sentence would have been imposed beyond a reasonable doubt had the invalid aggravating factors never been submitted to the jury." 132 F. 3d, at 252.

Petitioner claims that the court's analysis was so perfunctory as to be infirm. His argument is largely based on the following passage from *Clemons: "Under these circumstances,* it would require a detailed explanation based on the record for

404

us possibly to agree that the error in giving the invalid 'especially heinous' instruction was harmless." 494 U. S., at 753–754 (emphasis added). *Clemons,* however, involved quite different facts. There, an "especially heinous" aggravating factor was determined to be unconstitutionally vague. The only remaining aggravating factor was that the murder was committed during a robbery for pecuniary gain. The State had repeatedly emphasized the invalid factor and said little about the valid aggravator. See *id.,* at 753. Despite this, all that the Mississippi Supreme Court said was: "'We likewise are of the opinion beyond a reasonable doubt that the jury's verdict would have been the same with or without the "especially heinous, atrocious or cruel" aggravating circumstance.'" *Ibid.* (quoting *Clemons* v. *State,* 535 So. 2d 1354, 1364 (Miss. 1988)). We quite understandably required a "detailed explanation based on the record" in those circumstances.

The same "detailed explanation . . . on the record" that we required in *Clemons* may not have been necessary in this case. Cf. *Sochor* v. *Florida,* 504 U. S. 527, 540 (1992) (there is no federal requirement that state courts adopt "a particular formulaic indication" before their review for harmless error will pass scrutiny). But even if the Fifth Circuit's harmless-error analysis was too perfunctory, we think it plain, under the alternative mode of harmless-error analysis, that the error indeed was harmless beyond a reasonable doubt. See § 3595(c)(2) (federal death sentences are not to be set aside on the basis of errors that are harmless beyond a reasonable doubt). Had factors 3(B) and 3(C) been precisely defined in writing, the jury surely would have reached the same recommendation as it did. The Government's argument to the jury, see, *e. g.,* 25 Record 2733–2734, cured the nonstatutory factors of any infirmity as written. We are satisfied that the jury in this case actually understood what each factor was designed to put before it, and therefore have

no doubt that the jury would have reached the same conclusion had the aggravators been precisely defined in writing.

\* \* \*

For the foregoing reasons, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE GINSBURG, with whom JUSTICE STEVENS and JUSTICE SOUTER join, and with whom JUSTICE BREYER joins as to Parts I, II, III, and V, dissenting.

The Federal Death Penalty Act of 1994 (FDPA), 18 U. S. C. §§ 3591–3598 (1994 ed. and Supp. III), establishes a complex regime applicable when the Government seeks the ultimate penalty for a defendant found guilty of an offense potentially punishable by death. This case is pathmarking, for it is the first application of the FDPA. Two questions, as I comprehend petitioner's core objections, warrant prime attention.

First, when Congress specifies only two sentencing options for an offense, death or life without possibility of release, must the jury be told exactly that? Or, can a death decision stand despite misleading trial court "lesser sentence" instructions, specifically, instructions open to the construction that lack of a unanimous jury vote for either life or death would allow the judge to impose a sentence less severe than life in prison? Second, when the jury is unable to agree on a unanimous recommendation in a case in which death or life without possibility of release are the only sentencing options, must the judge then impose the life sentence? Or, is the judge required or permitted to impanel a second jury to make the life or death decision?

The Court of Appeals for the Fifth Circuit confronted these two questions and resolved both for the prosecution. The Fifth Circuit also tolerated the trial court's submission of two nonstatutory aggravating factors to the jury, although

the appeals court found those factors duplicative and vague.[1] The lower courts' disposition for death, despite the flawed trial proceedings, and this Court's tolerance of the flaws, disregard a most basic guide: "[A]ccurate sentencing information is an indispensable prerequisite to a [jury's] determination of whether a defendant shall live or die." *Gregg* v. *Georgia*, 428 U. S. 153, 190 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.). That "indispensable prerequisite" was not satisfied in this case. I would reverse and remand so that the life or death decision may be made by an accurately informed trier.

I

After authorizing the federal death penalty for a small category of cases in 1988,[2] Congress enacted comprehensive death penalty legislation in 1994. See FDPA, 108 Stat.

---

[1] The Court granted certiorari on three questions as phrased by the United States:

"'1. Whether petitioner was entitled to a jury instruction that the jury's failure to agree on a sentencing recommendation automatically would result in a court-imposed sentence of life imprisonment without possibility of release. 2. Whether there is a reasonable likelihood that the jury instructions led the jury to believe that deadlock on the penalty recommendation would automatically result in a court-imposed sentence less severe than life imprisonment. 3. Whether the Court of Appeals correctly held that the submission of invalid nonstatutory aggravating factors was harmless beyond a reasonable doubt.'" 525 U. S. 809 (1998); see also Brief for United States I.

I think it fair and "'principled,'" *ante,* at 402, to read the indigent petitioner's arguments on the questions presented with the willingness to overlook "loose drafting" that the Court consistently shows in evaluating the Government's case. See, *e. g., ante,* at 402; see also *ante,* at 395–402 (adopting Government's merits brief arguments although those arguments were not mentioned in the Brief in Opposition).

[2] The predecessor Anti-Drug Abuse Act of 1988 authorized the death penalty for murder resulting from certain drug-related offenses. See 21 U. S. C. § 848(e). The FDPA states that its procedures apply to "any [federal] offense for which a sentence of death is provided," 18 U. S. C. § 3591(a)(2), but does not repeal the 1988 Act, which differs in some respects. See, *e. g.,* 21 U. S. C. §§ 848(q)(4)–(9) (mandatory appointment of habeas counsel and provision of investigative and expert services).

1959.[3] Applicable to over 40 existing and newly declared death-eligible offenses, see 18 U. S. C. § 3591; §§ 60005–60024, 108 Stat. 1970–1982,[4] the FDPA prescribes penalty-phase procedures; principally, it provides for a separate sentencing hearing whenever the Government seeks the death penalty for defendants found guilty of a covered offense. See 18 U. S. C. § 3593.[5]

In death-eligible homicide cases, the Act instructs, the jury must respond sequentially to three inquiries; imposition of the death penalty requires unanimity on each of the three. First, the jury determines whether there was a killing or death resulting from the defendant's intentional engagement in life-threatening activity. See 18 U. S. C. § 3591(a)(2).[6]

---

[3] Congress enacted three statutes authorizing the death penalty between 1972 and 1988: Antihijacking Act of 1974, § 105, 88 Stat. 411–413, repealed by FDPA, § 6002, 108 Stat. 1970 (air piracy); Criminal Law and Procedure Technical Amendments Act of 1986, § 61, 100 Stat. 3614 (witness killing); Department of Defense Authorization Act, 1986, § 534, 99 Stat. 634–635 (amending the Uniform Military Justice Act to establish weighing procedures for courts-martial considering the death penalty for espionage). Earlier federal statutes authorizing the death penalty remained on the books, but were not invoked following this Court's decision in *Furman* v. *Georgia*, 408 U. S. 238 (1972) *(per curiam)*, which led to a hiatus in death penalty adjudications. See Little, The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role, 26 Ford. Urb. L. J. 347, 349, n. 5, 372–380 (1999).

[4] See *id.*, at 391, and n. 242 (estimating that the FDPA applies to at least 44 offenses).

[5] The sentencing hearing is before a jury unless the defendant, with the approval of the Government, moves for a hearing before the court. See 18 U. S. C. § 3593(b).

[6] Section 3591(a)(2) allows the death penalty for a defendant found guilty of a death-eligible homicide "if the defendant, as determined beyond a reasonable doubt at the [sentencing] hearing":

"(A) intentionally killed the victim;

"(B) intentionally inflicted serious bodily injury that resulted in the death of the victim;

"(C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in

Second, the jury decides which, if any, of the Government-proposed aggravating factors, statutory and nonstatutory, were proved beyond a reasonable doubt. See §3593(d).[7] Third, if the jury finds at least one of the statutory aggravators proposed by the Government, the jury then determines whether the aggravating factors "sufficiently outweigh" the mitigating factors to warrant a death sentence, or, absent mitigating factors, whether the aggravators alone warrant that sentence. §3593(e). The mitigating factors, seven statutory and any others tending against the death sentence, are individually determined by each juror; unlike aggravating factors, on which the jury must unanimously agree under a "beyond a reasonable doubt" standard, a mitigating factor may be considered in the jury's weighing process if any one juror finds the factor proved by a "preponderance of the evidence." See §§3592(a), (c), 3593(d). The weighing is not numeric; the perceived significance, not the number, of aggravating and mitigating factors determines the decision.[8]

## II

Louis Jones, Jr.'s crime was atrocious; its commission followed Jones's precipitous decline in fortune and self-governance on termination of his 22-year Army career. On February 18, 1995, Jones forcibly abducted Private Tracie

---

connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

"(D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act."

[7] The FDPA lists 16 aggravating factors for homicide and allows the jury to "consider whether any other aggravating factor for which notice has been given [by the Government] exists." 18 U. S. C. §3592(c). Nonstatutory aggravators "may include factors concerning the effect of the offense on the victim and the victim's family." §3593(a).

[8] See Little, *supra*, at 397 ("[Weighing] requires qualitative, not quantitative, evaluation." (internal quotation marks omitted)).

Joy McBride at gunpoint from the Goodfellow Air Force Base in San Angelo, Texas. In the course of the abduction, Jones struck Private Michael Alan Peacock with a handgun, leaving him unconscious. Thereafter, Jones sexually assaulted and killed McBride, leaving her body under a bridge located 20 miles outside of San Angelo. See 132 F. 3d 232, 237 (CA5 1998).

In the fall of 1995, Jones was tried before a jury and convicted of kidnaping with death resulting, in violation of 18 U. S. C. § 1201(a)(2). See 132 F. 3d, at 237–238. A separate sentencing hearing followed to determine whether Jones would be punished by death. See id., at 238.

At the close of the sentencing hearing, Jones submitted proposed jury instructions. Jones's instruction no. 4 would have advised the jury that it must sentence Jones to life without possibility of release rather than death "[i]f . . . any one of you is not persuaded that justice demands Mr. Jones's execution." App. 13.[9] Jones's instruction no. 5 would have advised that, if "the jury is unable to agree on a unanimous decision as to the sentence to be imposed," the jury should so inform the judge, who would then "impose a sentence of life imprisonment without possibility of release." Id., at 14.[10] Proposed instructions nos. 4 and 5, although inartfully

---

[9] Jones's instruction no. 4 read in relevant part:

"If, after fair and impartial consideration of all the evidence in this case, any one of you is not persuaded that justice demands Mr. Jones's execution, then the jury must return a decision against capital punishment and must fix Mr. Jones'[s] punishment at life in prison without any possibility of release." App. 13.

[10] Jones's instruction no. 5 read in relevant part:

"[I]f any of you—even a single juror—is not persuaded beyond a reasonable doubt that Mr. Jones'[s] execution is required in this case, then the entire jury must render a decision against his death. In that event, the jury must fix his punishment at life in prison without any possibility of release.

"Again, unless all twelve members of the jury determine that Mr. Jones should receive the death penalty, I will impose a sentence of life imprison-

drawn, unquestionably sought to convey this core information: If the jurors did not agree on death, then the only sentencing option, for jury or judge, would be life without possibility of release. Jones also objected, on vagueness grounds, to two of the three nonstatutory aggravators proposed by the Government. See *id.*, at 21–22, 28.

The District Court rejected Jones's proposed instructions nos. 4 and 5 and refused to strike or modify the nonstatutory aggravators to which Jones had objected. See *id.*, at 33. The trial court instructed the jury that it could recommend death, life without possibility of release, or a lesser sentence, in which event the court would decide what the lesser sentence would be. See *id.*, at 44.

The jury apparently found the case close. It rejected three of the seven aggravators the Government urged. See 132 F. 3d, at 238.[11] And one or more jurors found each of the specific mitigating factors submitted by Jones. See

---

ment without possibility of release. In the event, after due deliberation and reflection, the jury is unable to agree on a unanimous decision as to the sentence to be imposed, you should so advise me and I will impose a sentence of life imprisonment without possibility of release. . . .

"In the event you are unable to agree on Life Without Possibility of Release or Death, but you are unanimous that the sentence should not be less than Life Without Possibility of Release, you should report that vote to the Court and the Court will sentence the defendant to Life Without the Possibility of Release." App. 14–15.

In "Defendant's Objections to the Court's Charge," Jones "particularly direct[ed] the court's attention" to his proposed instruction no. 5. *Id.*, at 25, 30.

[11] The jury rejected the following aggravators: (1) the crime involved substantial planning and premeditation, see 18 U. S. C. § 3592(c)(9); (2) the crime created a grave risk to a person other than the victim, see § 3592(c)(5); and (3) Jones posed a future danger to the lives and safety of other persons. It found as aggravators: (1) Jones killed the victim during the commission of kidnaping, see § 3592(c)(1); (2) the crime was especially heinous, cruel, and depraved, see § 3592(c)6); (3) the victim's young age, slight stature, background, and unfamiliarity with San Angelo, Texas; and (4) the victim's personal characteristics and the effect of the offense on her family. See 132 F. 3d, at 238, and nn. 1, 2.

*ibid.*[12] The jury deliberated for a day and a half before returning a verdict recommending death.

Jones moved for a new trial on the ground, supported by postsentence juror statements, that the court's instructions had misled the jurors. Specifically, Jones urged that the charge led jurors to believe that a deadlock would result in a court-imposed lesser sentence; to avoid such an outcome, Jones asserted, jurors who favored life without possibility of release changed their votes to approve the death verdict. See App. 60–68, 75–80. The vote change, Jones maintained, was not hypothetical; it was backed up by juror statements. See *id.*, at 68, 79. The District Court denied the new trial motion. *Id.*, at 74, 81.

The Court of Appeals for the Fifth Circuit affirmed the death sentence. The appeals court ruled first that the District Court correctly refused to instruct that a jury deadlock would yield a court-imposed sentence of life imprisonment without possibility of release. 132 F. 3d, at 242–243. Jury deadlock under the FDPA, the Fifth Circuit stated, would not occasion an automatic life sentence; instead, that court declared, deadlock would necessitate a second sentencing hearing before a newly impaneled jury. *Id.*, at 243. The Court of Appeals further observed that, "[a]lthough the use of instructions to inform the jury of the consequences of a hung jury ha[s] been affirmed, federal courts have never been affirmatively required to give such instructions." *Id.*, at 245.

Next, the appeals court determined that the instructions, read in their entirety, "could not have led a reasonable jury to conclude that non-unanimity would result in the imposi-

---

[12] One or more jurors found each of Jones's ten specific mitigating factors. None found the eleventh, a catchall stating that "other factors in the defendant's background or character militate against the death penalty," see 18 U. S. C. § 3592(a)(8), but seven found the existence of an additional mitigating factor not submitted by Jones. See 132 F. 3d, at 238–239, n. 3.

tion of a lesser sentence." *Id.*, at 244. Jones could not rely on juror statements, the Fifth Circuit held, to show that the jury, in fact, was so misled when it sentenced him to death. See *id.*, at 245–246 (although Federal Rule of Evidence 606(b) is not applicable to FDPA penalty-phase proceedings, see 18 U. S. C. § 3593(c), "[t]he reasons for not allowing jurors to undermine verdicts in [trial proceedings] . . . apply with equal force to sentencing hearings").

Nor, in the Court of Appeals' view, did the District Court err *plainly* by conveying to the jury the misinformation that three sentencing options were available—death, life imprisonment without release, or some other lesser sentence. See 132 F. 3d, at 246–248. Noting that the FDPA takes account of all three possibilities, see 18 U. S. C. § 3593(e), while the kidnaping statute authorizes only two sentences, death or life imprisonment, see § 1201(a), the Fifth Circuit acknowledged that the District Court had erred in giving the jury a lesser sentence option: "[T]he substantive [kidnaping] statute takes precedence over the death penalty sentencing provisions" and limits the options to death or life imprisonment without release. 132 F. 3d, at 248. The appeals court nevertheless concluded that the District Court's error was not "plain" because the FDPA was new and no prior opinion had addressed the question; hence, no "clearly established law" was in place at the time of Jones's sentencing hearing. *Ibid.*

The Fifth Circuit also considered Jones's challenge to the nonstatutory aggravators presented to the jury at the Government's request. The court held that the two found by the jury—the victim's "young age, her slight stature, her background, and her unfamiliarity with San Angelo, Texas," and her "personal characteristics and the effect of the . . . offense on [her] family"—were "duplicative" of each other, and also impermissibly "vague and overbroad." *Id.*, at 250–251. The court declined to upset the death verdict, however, because it believed "the death sentence would have been imposed beyond a reasonable doubt had the invalid ag-

gravating factors never been submitted to the jury." *Id.*, at 252.

## III

The governing law gave Jones's jury at the sentencing phase a life (without release) or death choice. The District Court, however, introduced, erroneously, a third prospect, "some other lesser sentence." App. 44.[13] Moreover, the court told the jury "not to be concerned" with what that lesser sentence might be, for "[t]hat [was] a matter for the court to decide." *Ibid.* The jury's choice was clouded by that misinformation. I set out below my reasons for concluding that the misinformation rendered the jury's death verdict unreliable.

## A

The District Court instructed the jury:

"[Y]ou the jury, by unanimous vote, shall recommend whether the defendant should be sentenced to death, sentenced to life imprisonment without the possibility of release, or sentenced to some other lesser sentence.

. . . . .

". . . If you recommend that some other lesser sentence be imposed, the court is required to impose a sentence that is authorized by the law. In deciding what recommendation to make, you are not to be concerned with the question of what sentence the defendant might receive in the event you determine not to recommend a death sentence or a sentence of life without the possibility of release. That is a matter for the court to decide in the event you conclude that a sentence of death

---

[13] The problem was not, as the Court describes it, a failure to give the jury "[a] bit of information that might possibly influence an individual juror's voting behavior," *ante*, at 382; rather, the jury was "'affirmatively misled,'" cf. *ante*, at 381, by the repeated misinformation the charge and decision forms conveyed.

or life without the possibility of release should not be recommended.

. . . . .

"In order to bring back a verdict recommending the punishment of death or life without the possibility of release, all twelve of you must unanimously vote in favor of such specific penalty." App. 43–45.

Those instructions misinformed the jury in two intertwined respects: First, they wrongly identified a "lesser sentence" option;[14] second, the instructions were open to the reading that, absent juror unanimity on death or life without release, the District Court could impose a lesser sentence.

The Fifth Circuit, and the United States in its submission to this Court, acknowledged the charge error. See 132 F. 3d, at 248; *ante,* at 387, n. 8. Section 1201, which defines the crime, governs. It calls for death or life imprisonment, nothing less, and neither parole nor good-time credits could reduce the life sentence. See Brief for United States 13–14, n. 2 ("[W]e agree with petitioner that the only sentences that could have been imposed are death and life without release (because the kidnapping statute, 18 U. S. C. [§]1201, authorizes only death and life imprisonment, and neither parole nor good-time credits could reduce the life sentence).") The third option listed in the FDPA provision, "some other lesser sentence," §3593(e), is available only when the substantive statute does not confine the sentence to life or death. The Fifth Circuit found the error "not so obvious, clear, readily apparent, or conspicuous." 132 F. 3d, at 248. I disagree

---

[14] The verdict forms compounded the error by allowing the jurors to return as their decision the statement: "We the jury recommend some other lesser sentence." App. 59.

Jones does not press the District Court's identification of a lesser sentence option as an independent ground for reversal. That error, however, is an essential component of his argument that the misinformation conveyed by the District Court led the jury to believe that deadlock could result in a less-than-life sentence.

and would rank the District Court's misconstruction "plain error,"[15] because the FDPA unquestionably is a procedural statute that does not alter substantive prescriptions.[16] No serious doubt should have existed on that score.[17]

The flawed charge did not simply include a nonexistent option. It could have been understood to convey that, absent juror unanimity, some "lesser sentence" might be imposed by the court. That message came from instructions that the jury must be unanimous to "bring back a verdict recommending the punishment of death or life without the possibility of release," App. 45, that "some other lesser sentence" was possible, *id.*, at 44, and that the jury should not "be concerned with the . . . sentence the defendant might receive in the event [it] determine[d] not to recommend a death sentence or a sentence of life without the possibility of release," *ibid.* Jones's proposed instructions—that he

---

[15] JUSTICE BREYER does not believe that the District Court's submission of the (unobjected-to) jury instructions amounted to "plain error." In his view, the judge's (objected-to) failure to submit the defense's proposed instruction no. 5 amounted to an "abuse of discretion," for that proposed instruction was legally correct, the judge's failure to give it likely rested upon an erroneous view of the law, and it would have corrected the false impression created by the remaining instructions. See *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 405 (1990); App. 74 (order denying defendant's motion for new trial); cf. 132 F. 3d, at 242.

[16] The Fifth Circuit noted that Jones's counsel proposed language referring to a "lesser sentence," but reviewed for "plain error," rather than discounting the error as "invited," because the District Court did not use defense counsel's requested language. 132 F. 3d, at 246, n. 10. Although Jones's counsel did propose "lesser sentence" language, see, *e. g.,* App. 26, Jones's proposed instructions nos. 4 and 5 made one thing clear—his view that the jury and judge were required to impose life without possibility of release if the jury did not agree to death. See *supra*, at 409–410, nn. 9, 10.

[17] The Court, in a footnote, appears to recognize what should be beyond genuine debate: For Jones, "the only possible sentences were death and a life sentence." *Ante*, at 387, n. 8. In face of the District Court's lesser sentence instructions, four times given to the jury, it is difficult to comprehend why this Court "cannot see that any error occurred." See *ante*, at 390.

would be sentenced to life without possibility of release if the jury did not agree on death, see *supra*, at 409, and nn. 9, 10—should have made it apparent that he sought to close the door the flawed charge left open.[18]

There is, at least, a reasonable likelihood that the flawed charge tainted the jury deliberations. See *Boyde* v. *California*, 494 U. S. 370, 380 (1990) (where "[t]he claim is that the instruction is . . . subject to an erroneous interpretation," the "proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction" erroneously). As recently noted, a jury may be swayed toward death if it believes the defendant otherwise may serve less than life in prison. See *Simmons* v. *South Carolina*, 512 U. S. 154, 163 (1994) (plurality opinion) ("[I]t is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not."). Jurors may have been persuaded to switch from life to death to ward off what no juror wanted, *i. e.*, any chance of a lesser sentence by the judge.[19]

---

[18] It is the general rule, as the Government observes, and the Court repeats, that "'[a] party who has requested an instruction that has not been given is not relieved of the requirement that he state distinctly his objection to the instruction that is given.'" Brief for United States 24 (quoting 2 C. Wright, Federal Practice and Procedure § 484, p. 702 (2d ed. 1982)); see also *ante*, at 388. It is also true, however, that "the requirement of objections should not be employed woodenly, but should be applied where its application will serve the ends for which it was designed, rather than being made into a trap for the unwary." 2 Wright, *supra*, § 484, at 699–701. Here, Jones's proposed instruction that his default sentence was life without possibility of release apprised the District Court and the Government of his essential position.

[19] While precedent supports the Fifth Circuit's affirmation that statements attesting to the juror's understanding of the instructions are inadmissible, see 132 F. 3d, at 245–246, the statements Jones submitted do assert that apprehension of a lesser sentence the judge might impose in fact caused jurors to vote for a death sentence, see App. 68, 79. On a matter so grave, I would not discount those statements altogether. Cf. *Jorgensen* v. *York Ice Machinery Corp.*, 160 F. 2d 432, 435 (CA2 1947)

The Court, in common with the Fifth Circuit and the Solicitor General, insists it was just as likely that jurors not supporting death could have persuaded death-prone jurors to give way and vote for a life sentence. See *ante*, at 394; 132 F. 3d, at 246; Brief for United States 22. I would demur (say so what) to that position. It should suffice that the potential to confuse existed, *i. e.*, that the instructions could have tilted the jury toward death. The instructions "introduce[d] a level of uncertainty and unreliability into the fact-finding process that cannot be tolerated in a capital case." *Beck* v. *Alabama*, 447 U. S. 625, 643 (1980). "Capital sentencing should not be . . . a game of 'chicken,' in which life or death turns on the . . . happenstance of whether the particular 'life' jurors or 'death' jurors in each case will be the first to give in, in order to avoid a perceived third sentencing outcome unacceptable to either set of jurors." Reply Brief 7–8, n. 11.

B

The Fifth Circuit held that the District Court was not obliged to tell the jury that Jones's default penalty was life without possibility of release in part because the appeals court viewed that instruction as "substantively [in]correct." 132 F. 3d, at 242.[20] As the Fifth Circuit comprehended the law, if the jury deadlocked, "a second sentencing hearing

---

(L. Hand, J.) (while many defects in jury deliberation do not require reversal, "this has . . . nothing to do with what evidence shall be competent to prove the facts when the facts do require the verdict to be set aside, as concededly some facts do").

[20] Misinformation, not the District Court's failure to repeat the unanimity requirement each time it mentioned the jury's sentencing options, or to advise on the consequences of a deadlocked jury, is the harmful error at the heart of Jones's case. I therefore see no cause to dispute that "the Eighth Amendment does not require that the jury be instructed as to the consequences of their failure to agree." *Ante*, at 381. In my judgment, however, the court was obliged, in this life or death case, to make clear to the jury that Jones's minimum sentence was life without possibility of release.

would have to be held in front of a second jury impaneled for that purpose." *Id.*, at 243.[21]  But the FDPA, it seems to me clear, does not provide for a second shot at death.  The dispositive provision, as I read the Act, is § 3594, which first states that the court shall sentence the defendant to death or life imprisonment without possibility of release if the jury so recommends, and then continues:

> "Otherwise, the court shall impose any lesser sentence that is authorized by law.  Notwithstanding any other law, if the maximum term of imprisonment for the offense is life imprisonment, the court may impose a sentence of life imprisonment without possibility of release."  18 U. S. C. § 3594.

The "[o]therwise" clause, requiring judge sentencing, becomes operative when a jury fails to make a unanimous recommendation at the close of deliberations.  The Fifth Circuit's attention was deflected from the § 3594 path by § 3593(b)(2)(C), which provides for a sentencing hearing "before a jury impaneled for the purpose of the hearing if . . . the jury that determined the defendant's guilt was discharged for good cause."  Discharge for "good cause" under § 3593(b)(2)(C), however, is most reasonably read to cover guilt-phase (and, by extension, penalty-phase) juror disqualification due to, *e. g.*, exposure to prejudicial extrinsic information or illness.  The provision should not be read expansively to encompass failure to reach a unanimous life or death decision.

The Government refers to a "background rule" allowing retrial if the jury is unable to reach a verdict, and urges that

---

[21] At oral argument, counsel for the United States maintained that it would be up to the prosecutor, when a jury is deadlocked, to request a new panel or to allow the judge to decide on the sentence.  See Tr. of Oral Arg. 41.  But this could be done only once, the Government maintained: In the event of a second deadlock, it would be the court's obligation to impose the sentence.  See *id.*, at 46.

the FDPA should be read in light of that rule. Brief for United States 29. But retrial is not the prevailing rule for capital penalty-phase proceedings. As the Government's own survey of state laws shows, in life or death cases, most States require judge sentencing once a jury has deadlocked. See *id.*, at 32; App. to Brief for United States 1a–6a (identifying 25 States in which the court imposes sentence upon deadlock and three States in which a new sentencing hearing is possible); see also Acker & Lanier, Law, Discretion, and the Capital Jury: Death Penalty Statutes and Proposals for Reform, 32 Crim. L. Bull. 134, 169 (1996) ("In twenty-five of the twenty-nine states in which capital juries have final sentencing authority, . . . a deadlocked sentencing jury is transformed into a 'lifelocked' jury. That is, the jury's inability to produce a unanimous penalty-phase verdict results in the defendant's being sentenced to life imprisonment or life imprisonment without parole." (footnotes omitted)).

Furthermore, at the time Congress adopted the FDPA, identical language in the predecessor Anti-Drug Abuse and Death Penalty Act of 1988 had been construed to mandate court sentencing upon jury deadlock. See *United States* v. *Chandler*, 996 F. 2d 1073, 1086 (CA11 1993) ("If the jury does not [recommend death], the district court sentences the defendant."); *United States* v. *Pitera*, 795 F. Supp. 546, 552 (EDNY 1992) ("Absent a recommendation of death, the court must sentence a defendant.").[22] The House Report suggests that Congress understood and approved that construction. See H. R. Rep. No. 103–467, p. 9 (1994) ("If the jury is not

---

[22] Like the FDPA, the Anti-Drug Abuse Act provides for a new sentencing jury if the guilt-phase jury "has been discharged for good cause," 21 U. S. C. §848(i)(1)(B)(iii), and states, immediately after providing for the death sentence upon jury recommendation, that "[o]therwise the court shall impose a sentence, other than death, authorized by law," §848(*l*). Under the Anti-Drug Abuse Act, unlike the FDPA, the only binding recommendation the jury can make is for death.

unanimous, the judge shall impose the sentence pursuant to Section 3594.").

## IV

Piled on the key instructional error, the trial court presented the jury with duplicative, vague nonstatutory aggravating factors. The court told the jury to consider as aggravators, if established beyond a reasonable doubt, factors 3(B)—the victim's "young age, her slight stature, her background, and her unfamiliarity with San Angelo, Texas"—and 3(C)—the victim's "personal characteristics and the effect of the instant offense on [her] family." 132 F. 3d, at 250.[23] The jury found both. See *ibid.*

The District Court did not clarify the meaning of the terms "background" and "personal characteristics." See *id.*, at 251. Notably, the term "personal characteristics" in aggravator 3(C) necessarily included "young age," "slight stature," "background," and "unfamiliarity," factors the jury was told to consider in aggravator 3(B). I would not attribute to the Court genuine disagreement with that proposition. But see *ante*, at 399. Double counting of aggravators "creates the risk of an arbitrary death sentence." 132 F. 3d, at 251; see also *United States* v. *McCullah,* 76 F. 3d 1087, 1111 (CA10 1996) ("Such double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily."). The Fifth Circuit considered the District Court's lapse inconsequential, concluding that "the two remaining statutory aggravating factors . . . support the sentence of death, even after considering the eleven mitigating factors." 132 F. 3d, at 252.[24]

---

[23] Counsel specifically objected to these factors. See App. 21–22, 28.

[24] The Government now argues, contrary to the Fifth Circuit's conclusion, that aggravating factors 3(B) and 3(C) are not duplicative, vague, or overbroad. See Brief for United States 40–45. The Court granted certiorari on the Government's reformulated questions, which presumed the incorrectness of the aggravators. See *supra*, at 406, n. 1. In its brief

Appellate courts should hesitate to assert confidence that "elimination of improperly considered aggravating circumstances could not possibly affect the balance." *Barclay* v. *Florida*, 463 U. S. 939, 958 (1983). Adding the overlapping aggravators to the more disturbing misinformation conveyed in the charge, I see no basis for concluding " 'it would have made no difference if the thumb had been removed from death's side of the scale.' " 132 F. 3d, at 251 (quoting *Stringer* v. *Black*, 503 U. S. 222, 232 (1992)).

V

The Fifth Circuit's tolerance of error in this case, and this Court's refusal to face up to it, cannot be reconciled with the recognition in *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (plurality opinion), that "death is qualitatively different." If the jury's weighing process is infected by the trial court's misperceptions of the law, the legitimacy of an ensu-

---

in opposition, the Government did not challenge the Fifth Circuit's determination of error, but focused solely on whether the error was harmless. JUSTICE THOMAS, writing for a plurality, nevertheless addresses the Government's newly raised argument. See *ante*, at 395–402. I would hold the Government to a tighter rein and dismiss the tardy argument as waived. See *Roberts* v. *Galen of Va., Inc.*, 525 U. S. 249, 253 (1999) *(per curiam); South Central Bell Telephone Co.* v. *Alabama*, 526 U. S. 160 (1999); cf. this Court's Rule 15.2.

It is evident that the issue held back by the Government was not "predicate to an intelligent resolution of the question presented." *Ohio* v. *Robinette*, 519 U. S. 33, 38 (1996) (internal quotation marks omitted). But see *ante*, at 397, n. 12. JUSTICE THOMAS treats the two issues as separate and independent. He maintains first that there was no error. Writing for the Court, he then proceeds to assume there was error and concludes that any error was harmless. Either holding would do to support the Court's disposition. See, *e. g., United States* v. *Hasting*, 461 U. S. 499, 506, n. 4, 510–512 (1983) (holding presumed error harmless rather than deciding whether there was, in fact, error; Court explains "[t]he question on which review was granted assumed that there was error and the question to be resolved was whether harmless-error analysis should have applied"); *id.*, at 512–513 (STEVENS, J., concurring) (Court should decide case on the ground that there was no error, without reaching harmless-error question).

ing death sentence should not hinge on defense counsel's shortfalls or the reviewing court's speculation about the decision the jury would have made absent the infection. I would vacate the jury's sentencing decision and remand the case for a new sentencing hearing, one that would proceed with the accuracy that superintendents of the FDPA should demand.