ROY B. DALTON JR., United States District Judge
Now before the Court are the parties' pre-trial motions in this federal capital case for which the Court determined no hearing is required.[1] Upon thorough consideration, *1192 the Court makes the following rulings.
BACKGROUND
On February 14, 2018, the grand jury returned a three-count second superseding indictment charging Defendant Jarvis Wayne Madison with: (1) kidnapping that resulted in a death in violation of 18 U.S.C. § 1201(a) ("Kidnapping Offense "); (2) interstate domestic violence in violation of 18 U.S.C. §§ 2261(a)(1) and (b)(1) ; and (3) interstate stalking in violation of 18 U.S.C. §§ 2261A(1) and 2261(b)(1). (Doc. 211.) The Government then filed a notice of intent to seek the death penalty as to the Kidnapping Offense. (Doc. 230 ("Notice ").) This Notice identified the factors the Government contends warrant the imposition of the death penalty under the provisions of the Federal Death Penalty Act, 18 U.S.C. §§ 3591 - 3598 ("FDPA "). (Id. )
Beyond being eighteen or older at the time of the offense, the Government proposed as statutory threshold factors that Defendant: (1) intentionally killed the victim; (2) intentionally inflicted serious bodily injury that resulted in the death of the victim; (3) intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of that act; and (4) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of such action. (Id. at 2-3 (citing 18 U.S.C. §§ 3591(a)(2)(A)-(D) ).)
For statutory aggravating factors, the Government proposed one: the death of the victim or injury resulting in the death of the victim occurred during the commission or attempted commission of, or during the immediate flight from the commission of, the kidnapping. (Id. at 3 (citing § 3592(c)(1) ).) Last, the Government proposed two non-statutory aggravating factors: victim impact and pattern of domestic abuse. (Id. at 4 (citing § 3593(a)(2) ) ); see also § 3592(c) ("The jury ... may consider whether any other aggravating factor for which notice has been given exists.").
Following this, the parties filed various pre-trial motions that have now been fully briefed. The Court takes each in turn, but starts with an overview of the FDPA.
DISCUSSION
I. Federal Death Penalty Act
To be eligible for the death penalty under the FDPA, a defendant must first be found guilty of a death penalty eligible crime. 18 U.S.C. § 3591. A kidnapping charge under § 1201 that results in "the death of any person" counts. See § 1201 ("[I]f the death of any person results, [the Defendant] shall be punished by death or life imprisonment."). Thus, if a defendant is found guilty of kidnapping with a resulting death, a separate sentencing hearing follows "to determine the punishment to be imposed." § 3593(b). Before a jury may consider death, it must make specific findings beyond a reasonable doubt: First, a threshold inquiry into the defendant's mental state under § 3592(a)(2); and if statutory intent is found, at least one of the statutory aggravating factors in § 3592(c). Only after the jury makes these findings is the defendant death penalty eligible.
*1193 If eligibility is met, the jury "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death." § 3593(e). To that end, the FDPA allows the presentation of information "as to any matter relevant to the sentence ... regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." § 3593(c). The Government maintains the burden of establishing aggravating factors beyond a reasonable doubt, while the defendant has the burden of establishing mitigating factors by a preponderance of the information. Id. "Based upon this consideration, the jury by unanimous vote ... shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." § 3593(e). If "it is determined that imposition of a sentence of death is justified," the defendant "shall be sentenced to death." § 3591(a).
With that backdrop, the Court turns first to Defendant's motions.
II. Defense Motions
A. Motion to Declare 18 U.S.C. § 1201(a) Unconstitutional and to Strike Death Penalty Notice
First, the Court tackles Defendant's motion to declare the federal kidnapping statute unconstitutional and strike the Notice. (Doc. 290.) The Government opposes. (Doc. 304.)
1. Factual background[2]
Married in 2013, Defendant and the victim, R.M., were estranged at the time of the offenses charged in the Indictment. (Doc. 304, p. 4.) On November 15, 2016, R.M. reported a domestic violence incident to the Indiana state police. (Id. ) During the incident Defendant confined R.M. inside his car, at gunpoint, and verbally threatened to kill her. (Id. ; see also Doc. 1, ¶ 6) When R.M. first attempted to escape, Defendant fired a single round shot at R.M, narrowly missing her. (Doc. 304, p. 4; see also Doc. 1, ¶ 6.) On her second escape attempt, R.M. succeeded, taking refuge in a Wal-Mart where a store employee called 911. (Doc. 304, p. 4.)
An Indiana State Police Trooper responded to the 911 call and made an official report concerning the incident. (Id ; see also Doc. 1, ¶ 7.) By the time law enforcement arrived, Defendant fled the scene. (Doc. 304, p. 4.) Following the incident, R.M. left Indiana with her aunt, traveling to Ormond Beach, Florida where she resided with her aunt until her disappearance on November 27, 2016. (Id. )
According to the Government, beginning on November 15, 2016, after R.M. fled to Florida, Defendant began travelling southbound. (Id. at 4-5.) On November 27, 2016, he arrived in Volusia County where he first surveilled the house of R.M.'s aunt. (Id. at 6; see also Doc. 1, ¶ 9.) That same day, R.M. went jogging and Defendant, disguised, approached R.M. (Doc. 304, p. 6.) At some point between November 27, 2016, and December 2, 2016, Defendant shot R.M. multiple times while she was a passenger in his car. (Id. ) Following R.M.'s disappearance, her aunt reported her missing to law enforcement. (Id. at 7.) On December 2, 2016, law enforcement located and arrested Defendant in Louisville, Kentucky *1194 where he ultimately admitted to shooting R.M. three times while inside his car but claimed she voluntarily went with him from Florida. (Id. ; see also Doc. 1, ¶ 12.) Defendant then agreed to assist law enforcement in locating R.M.'s remains, and that evening he led agents to the site of R.M.'s burial where they located R.M.'s partially buried body. (Doc. 304, p. 8; Doc. 1, ¶¶ 12, 17.)
2. Analysis
Section 1201(a) criminalizes kidnappings when a defendant "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person ... when the person is willfully transported in interstate or foreign commerce." Defendant brings both a facial and as-applied challenge, contending that § 1201(a) is unconstitutionally vague under the Fifth and Eighth Amendments and overbroad under the First Amendment.[3] (Doc. 290, p. 1.)
The Fifth Amendment's due process guarantee is violated "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." Johnson v. United States , --- U.S. ----, 135 S.Ct. 2551, 2556, 192 L.Ed.2d 569 (2015) ; see also Maynard v. Cartwright , 486 U.S. 356, 361, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Even if a criminal statute can be read to cover some conduct, it still may be void for vagueness. See Johnson , 135 S.Ct. at 2560-61 ("[A]lthough statements in some of [the U.S. Supreme Court's] opinions could be read to suggest otherwise, [its] holdings contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."). Instead, whether a law is void for vagueness depends on "whether the law is so incoherent that it either 'denies fair notice to defendants' or 'invites arbitrary enforcement by judges.' " United States v. Caldwell , 655 F. App'x 730, 732 (11th Cir. 2016) (per curiam) (quoting Johnson , 135 S.Ct. at 2557 ).[4]
Even if a law is not unconstitutionally vague it may be impermissibly overbroad. Agan v. Vaughn , 119 F.3d 1538, 1542 (11th Cir. 1997). The distinct concept of overbreadth "is part of first amendment doctrine." Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale , 922 F.2d 756, 760 n. 4 (11th Cir. 1991). A statute may be invalidated as overbroad "if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' " United States v. Stevens , 559 U.S. 460, 473, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010), superseded by statute on other grounds (quoting Wash. State Grange v. Wash. State Republican Party , 552 U.S. 442, 449 n.6, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) ).
a. As-applied challenge
First, Defendant claims that the portion of § 1201(a) that refers to holding a victim "for ransom or reward or otherwise" is unconstitutional as applied to his conduct. (Doc. 290, p. 11.) An as-applied *1195 challenge addresses whether a statute is unconstitutional on the facts of a particular case. See, e.g., United States v. Vickers , 578 F.2d 1057, 1058 (5th Cir. 1978) (analyzing an as-applied challenge to § 1201(a)'s "or otherwise" language").[5] According to Defendant, there is no way he could have known his conduct violated the federal kidnapping statute given the complete lack of evidence that Defendant was holding R.M. involuntarily following her escape on November 15, 2016. (See Doc. 290, pp. 11-12.) Instead, pointing to the criminal complaint's allegations and unidentified "evidence," Defendant argues that he did not hold R.M involuntarily after November 15, 2016. (See id. at 11 (citing Doc. 1, ¶ 11).)
To begin, Defendant's argument does not appear to be constitutional challenge at all; rather, his contention attacks only the Government's ability to prove its case.[6] (See id. at 11-12.) But "[t]here is no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of sufficiency of the evidence." United States v. Salman , 378 F.3d 1266, 1268 (11th Cir. 2004) (internal quotations omitted). So to the extent Defendant raises a proof issue at this point, the motion fails. If Defendant contends that the evidence presented at trial does not support the elements of the kidnapping offense, he can file a motion for acquittal under Rule 29. See id.
To the extent Defendant's as-applied challenge seeks to invalidate § 1201(a) on more than just the sufficiency of the evidence, it is not appropriately raised pre-trial. Whether Defendant's conduct sufficiently brings him within the prohibitions proscribed by § 1201(a)(1) depends on a consideration of facts, and because the facts proffered here may or may not be developed at trial, it is premature to resolve the as-applied constitutional challenge. See, e.g., United States v. Graves , No. 1:13-cr-417-WSD-JSA, 2014 WL 2589428, at *2, *5, *10 (N.D. Ga. June 9, 2014) (adopting recommendation finding the defendants' as-applied challenge to § 1201(a) premature and noting that such a motion should be considered after the presentation of evidence at trial).
The Government's suggestion that Defendant's as-applied vagueness argument is foreclosed by binding and persuasive authority in the Eleventh Circuit is misplaced in the context of an as-applied challenge. (Doc. 304, pp. 12-14.) It relies on Vickers , 578 F.2d at 1057 and United States v. Griffin , 547 F. App'x 917, 921 (11th Cir. 2013) for this proposition. (See id. ) But those as-applied challenges to § 1201(a)'s "or otherwise" language arose in the post-conviction context where the appellate court had the benefit of a fulsome trial record. See Vickers , 578 F.2d at 1058 ; Griffin , 547 F. App'x at 921. Such is not the case here, and the Court declines to speculate as to the propriety of Defendant's as-applied challenge prior to trial. So the motion is due to be denied as to this argument.
b. Facial challenge
Next, Defendant asserts a go-for-broke proposition that § 1201(a) is facially invalid, claiming it is both vague and overbroad. (See Doc. 290, pp. 7-11.) As noted above, a law is vague if " 'it either denies fair notice to defendants' or 'invites arbitrary enforcement by judges.' "
*1196 Caldwell , 655 F. App'x at 732 (quoting Johnson , 135 S.Ct. at 2557 ).[7] Defendant argues that the phrase "or otherwise" renders § 1201(a) unconstitutionally vague because it specifies no standard at all, potentially criminalizing any articulable reason for holding a person. (See Doc. 290, p. 10.)
Were the Court confined to the words of § 1201(a) alone, Defendant's argument may have merit. But the Court does not work from a blank slate. Courts have interpreted the phrase "or otherwise" to include nonpecuniary motives. See United States v. Healy , 376 U.S. 75, 81-82, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964), superseded by statute on other grounds (noting that under § 1201(a) the benefit a defendant receives does not have to be pecuniary, nor does it have to be illegal); Gooch v. United States , 297 U.S. 124, 128, 56 S.Ct. 395, 80 L.Ed. 522 (1936) (construing § 1201(a) to encompass any benefit which a captor might attempt to receive for himself); United States v. Lewis , 115 F.3d 1531, 1536 (11th Cir. 1997) (holding that a defendant's admission that he kidnapped a victim for "companionship" constituted a benefit and satisfied the "or otherwise" language). Aided by judicial interpretation, the Court finds that the "or otherwise" language of § 1201(a) provides fair notice to defendants and does not invite arbitrary enforcement by judges. So Defendant's facial vagueness challenge fails.
Defendant's overbreadth argument also lacks merit. In Defendant's view, § 1201(a) reaches constitutionally protected activity because it interferes with a First Amendment right to association, namely marriage. (Doc. 290, p. 7.) Relying on Chatwin v. United States , 326 U.S. 455, 66 S.Ct. 233, 90 L.Ed. 198 (1946) for this proposition, Defendant asks the Court to "apply the strong medicine of overbreadth analysis." Wash. State Grange v. Wash. State Republican Party , 552 U.S. 442, 449 n.6, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (internal quotations and citations omitted). This the Court will not do. In Chatwin , the defendants, only one of whom was the victim's spouse, were charged with kidnapping. 326 U.S. at 457-59, 66 S.Ct. 233. The Supreme Court reversed the kidnapping convictions based on insufficient evidence that the victim was "held for ransom or reward or otherwise," not because application of the statute would interfere with the fundamental right to marriage. See id. at 460, 66 S.Ct. 233. Given Defendant's complete misinterpretation of Chatwin , he has failed to establish that a "substantial number of [ § 1201(a)'s] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." See Stevens , 559 U.S. at 473, 130 S.Ct. 1577. So Defendant's overbreadth challenge fails and this motion is denied.
B. Motion to Strike Death Penalty Notice Because the Federal Death Penalty Act Violates the Tenth Amendment to the United States Constitution
Next, Defendant seeks a declaration that the FDPA is unconstitutional because *1197 two of its provisions violate the state-federal balance safeguarded by the Tenth Amendment, compelling state officials to carry out federal executions. (Doc. 300.) Based on this constitutional infirmity, he requests the Court strike the Notice. (Id. at 2.) The Government opposes and presents two arguments: (1) Defendant's claim is not ripe because he does not have an execution date; and (2) the plain language of the FDPA defeats Defendant's constitutional challenge under the Tenth Amendment. (Doc. 310.) On review, the Government's first argument carries the day.
The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. So Congress' legislative powers are not plenary, rather they are limited as enumerated. See id. "And conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." Murphy v. Nat'l Collegiate Athletic Ass'n , --- U.S. ----, 138 S.Ct. 1461, 1476, 200 L.Ed.2d 854 (2018). This "anticommandeering principle" recognizes the limit on congressional authority. Id.
Here, Defendant's constitutional challenge focuses on two allegedly offending provisions- 18 U.S.C. §§ 3596 and 3597. (Doc. 300, p. 2.) Section 3596 is the FDPA's implementation provision and provides that:
A person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence. When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law [ ("Implementation Provision ") ].
§ 3596(a). The FDPA also provides for the use of state facilities to implement federal executions:
A United States marshal charged with supervising the implementation of a sentence of death may use appropriate State or local facilities for the purpose, may use the services of an appropriate State or local official or of a person such an official employs for the purpose, and shall pay the costs thereof in an amount approved by the Attorney General. [ ("Use Provision ") ].
18 U.S.C. § 3597 (emphasis added). The Implementation and Use Provisions, Defendant submits, conscript state officials and state facilities to conduct federal executions in violation of the Tenth Amendment's anticommandeering principle. (See Doc. 300, pp. 3-8.) But as the Government points out, this argument is not ripe. (See Doc. 310, pp. 3-6.)
The ripeness doctrine springs "from the Constitution's Article III requirement that the jurisdiction of the federal courts be limited to actual cases or controversies." Elend v. Basham , 471 F.3d 1199, 1204-05 (11th Cir. 2006) (citations omitted). It "keeps federal courts from deciding cases prematurely" and "engaging in speculation or wasting their resources through the review of potential or abstract disputes." United States v. Rivera , 613 F.3d 1046, 1050 (11th Cir. 2010)
*1198 (quoting Beaulieu v. City of Alabaster , 454 F.3d 1219, 1227 (11th Cir. 2006), Digital Props., Inc. v. City of Plantation , 121 F.3d 586, 589 (11th Cir. 1997) ). "A claim is not ripe for adjudication if it rests 'upon contingent future events that may not occur as anticipated, or indeed may not occur at all.' " Texas v. United States , 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (quoting Thomas v. Union Carbide Agric. Prods. Co. , 473 U.S. 568, 580-81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) ).
Here, Defendant posits that the Implementation and Use Provisions could-at some future date following his conviction and sentencing-conscript state officials to carry out his death sentence, which would violate the Tenth Amendment. (Doc. 300, pp. 6-17.) But this argument is not ripe, rooted in speculation, as the Court is still in the pre-trial posture and no death sentence has been imposed. As such, the Court can neither address nor strike down these FDPA provisions as unconstitutional. See, e.g., United States v. Sampson , No. 01-10384-LTS, 2017 WL 3495703, at *32 n.45 (D. Mass. Aug. 15, 2017) (rejecting on ripeness grounds the defendant's post-trial Tenth Amendment challenge to the FDPA based on the theory that it commandeers state officials and state facilities by conscripting them to carry out federal executions). This motion is denied.
C. Motion for Order Striking Death Penalty Notice as Offending Evolving Standards of Decency Based Upon Defendant's Irreversible Serious Mental Illness and Substantial Brain Damage
Continuing on, Defendant moves to strike the death penalty notice based on mental illness and substantial brain damage. (Doc. 301.) Invoking the Eighth Amendment's "evolving standards of decency" framework relied on by the Supreme Court in Atkins v. Virginia , 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) and Roper v. Simmons , 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) to categorically exclude individuals with intellectual disabilities and juveniles from the death penalty, Defendant claims that death can never be an appropriate punishment for him given his permanent brain damage and severe mental illness.[8] (Id. at 2-20); see also Hall v. Florida , 572 U.S. 701, 134 S.Ct. 1986, 1990, 188 L.Ed.2d 1007 (2014) (noting that the Court previously used the term "mental retardation," but now employs the term "intellectual disability" "to describe the identical phenomenon"). As support, he references: (1) non-binding caselaw where various judges have expressed views that the death penalty should not apply to those with severe mental illnesses; (2) public opinion polls; (3) international law and opinion; (4) literature from the American Bar Association; (5) state legislative action; and (6) Defendant's individual characteristics. (Doc. 301, pp. 2-20.) The Government opposes, noting that Defendant's argument is foreclosed by Atkins , where the Supreme Court did not categorically bar imposing the death penalty on individuals with mental illnesses or severe brain damage; and Defendant's social policy arguments are legally unsupported. (See Doc. 314.)
On review, the Court agrees with the Government. Since Atkins , the Supreme Court has not added individuals *1199 with mental illnesses or severe brain damage to the category of individuals who cannot receive the death penalty. Rather, evidence of a defendant's mental illness may be presented to the jury during the sentencing phase as a mitigating factor for not imposing the death penalty. See 18 U.S.C. § 3592(a). Given this established framework, Defendant's argument that applying the death penalty to those with mental illnesses violates the constitution rings hollow. The Court is bound to apply the law as written, and currently, the Eighth Amendment does not exclude individuals with severe mental illnesses and serious brain damage from the death penalty. The motion is denied.
D. Motion to Strike Death Penalty Notice Based Upon Influence of Arbitrary Factor-Race and Gender of Victim
Defendant then challenges the death penalty notice as unconstitutional in light of the race and gender of the victim here. (Doc. 264.) Relying on statistical findings, Defendant contends that when the victim is a white female, the likelihood of a federal death sentence increases. (Id. at 14-16.) From this correlation, Defendant avers he has established a prima facie case that: (1) he has suffered and is likely to continue to suffer prejudice compared to similarly situated death-eligible federal defendants; and (2) the federal death penalty is arbitrary.[9] (Id. at 16-20.) So, beyond striking the death penalty notice, he seeks related discovery and an evidentiary hearing to explore the white female victim effect. (Id. at 17-18, 20.) To that end, Defendant filed a separate motion for this discovery (Doc. 274), which was denied without prejudice (Doc. 284). No renewed motion was filed, despite Defendant being given the opportunity. (See Doc. 284, p. 2.) Thus, it appears Defendant no longer seeks the discovery or hearing initially requested. In any event, Defendant's arguments are again foreclosed by Supreme Court precedent, so none of this requested relief is due.
First, "to prevail under the Equal Protection Clause, [Defendant] must prove that the decisionmakers in his case acted with discriminatory purpose." See McCleskey v. Kemp , 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Pointing to "bare statistical discrepancies" doesn't do the trick. Id. ; see United States v. Sampson , 486 F.3d 13, 26 (1st Cir. 2007). Rather, Defendant must point to evidence specific to this case that would support an inference that the victim's race and gender played a part in the decision to seek the death penalty. See McCleskey , 481 U.S. at 292-93, 107 S.Ct. 1756. Nothing Defendant offers fits the bill (see Doc. 264-1), and as Defendant failed to elaborate how additional discovery could get there (see Doc. 284) or present supplemental findings as suggested (see Doc. 264, p. 21), this claim fails.
Similarly, Defendant's Eighth Amendment challenge founders. He claims his statistics show the imposition of the federal death penalty is unconstitutionally arbitrary. (Id. at 18-20.) Again, McCleskey negates this argument. See 481 U.S. at 301-13, 107 S.Ct. 1756 ; see also Sampson , 486 F.3d at 26 (applying McCleskey to FDPA challenge). Like the sentencing scheme the Court evaluated in McCleskey , the FDPA's sentencing procedures "focus discretion 'on the particularized nature of *1200 the crime and the particularized characteristics of the individual defendant.' " See McCleskey , 481 U.S. at 308, 107 S.Ct. 1756 (quoting Gregg v. Georgia , 428 U.S. 153, 206, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ). So variant outcomes stemming from such a scheme does not make a constitutional violation. McCleskey , 481 U.S. at 306-07, 107 S.Ct. 1756. Rather, each capital case is different. Id. at 311, 107 S.Ct. 1756. They are individualized, defendant-driven inquiries whose results are often difficult to explain. See id. And although any capital sentencing system is not perfect, "constitutional guarantees are met when 'the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible.' " Id. at 313, 107 S.Ct. 1756 (quoting Singer v. United States , 380 U.S. 24, 35, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965) ) (alteration in original).
Against this, Defendant's cited statistics demonstrate no constitutionally significant risk of racial and gender bias under the FDPA for Defendant. (See Docs. 264, pp. 5-20; 264-1.) Rather, Defendant takes an amalgam of articles and studies discussing race and gender outcomes in state capital cases to extrapolate that when the victim is a white female, the death penalty is more likely. (Id. at 5-13.) Then, Defendant relies on an outcome-driven statistical analysis of federal capital cases that found a statistically significant correlation between the presence of a white female victim and the likelihood of a death sentence. (Id. at 14-16; Doc. 264-1.) But like the study rejected in McCleskey , such "[s]tatistics at most may show only a likelihood that a particular factor entered into some decisions." See 481 U.S. at 308, 107 S.Ct. 1756. What Defendant presents, therefore, cannot support his Eighth Amendment claim. As such, Defendant's motion to strike the death penalty notice based upon the race and gender of the victim is denied.
E. Motion to Strike Notice of Intent to Seek Death Due to Evolving Standards of Decency that Preclude a Death Penalty Based Solely on the Felony-Murder Aggravating Factor
In this motion, Defendant submits that seeking the death penalty when the sole statutory aggravating factor is that the death occurred during the commission of another crime is arbitrary and violates the Eighth Amendment's evolving standards of decency. (Doc. 254.) Boiled down, Defendant argues that because he is charged with kidnapping resulting in a death under 18 U.S.C. § 1201, the aggravating factor of finding the death occurred during the commission or attempted commission of kidnapping merely duplicates the underlying offense so that if he is found guilty of the offense, he would "qualify" for the ultimate punishment of death. (Id. at 3; see generally id. at 1-5.) As there are no other statutory aggravating factors charged but compelling mitigation evidence since the alleged crime arose from domestic violence and Defendant suffers from severe mental illness, Defendant argues that seeking the death penalty here violates the Eighth Amendment. (Id. at 5-11.) The United States opposes on the grounds that Defendant's argument concerning the statutory aggravating factor is foreclosed by precedent and reiterates that seeking the death penalty here is constitutional. (Doc. 270.)
The Government is correct. "To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found *1201 guilty of murder.' " Lowenfield v. Phelps , 484 U.S. 231, 244, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (quoting Zant v. Stephens , 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) ). Requiring a jury to find at least one aggravating circumstance during the sentencing phase before it may impose death-as the FDPA does-is "a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion." See id. ; see 18 U.S.C. §§ 3591(a), 3592(c)(1). With this, even if the aggravating factor repeats an element of the crime, it is constitutional so long as this narrowing function is performed. See Lowenfield , 484 U.S. at 246, 108 S.Ct. 546 ; see also United States v. Jones , 132 F.3d 232, 248-49 (5th Cir. 1998), aff'd 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).
For Defendant, the sole statutory aggravating factor charged is "death during commission of another crime." (Doc. 230, p. 3.) As defined, this factor requires finding "[t]he death, or injury resulting in death, occurred during the commission or attempted commission of, or during the immediate flight from the commission of , an offense under ... section 1201 (kidnapping)." 18 U.S.C. § 3592(c)(1) (emphasis added). Importantly, this statutory aggravating factor differs from § 1201, which states generally that "if the death of any person results [from the kidnapping, the defendant] shall be punished by death or life imprisonment." 18 U.S.C. § 1201(a) (emphasis added). In other words, the statutory aggravating factor narrows the class of death-eligible people § 1201 contemplates, as a finding in the guilt phase that kidnapping occurred and a death resulted does not automatically mean the statutory aggravating factor is met. See Lowenfield , 484 U.S. at 245-46, 108 S.Ct. 546 ; see also Jones , 132 F.3d at 248-49. Rather, to meet the statutory aggravating factor, the jury in the penalty phase must consider the circumstances of the death, i.e. , whether Defendant caused the death and when it occurred. See Jones , 132 F.3d at 249. So like Lowenfield , repeating the elements of the crime here as an aggravating factor does not violate the Eighth Amendment, as the statutory aggravating factor genuinely narrows the jury's discretion in determining whether to impose the death penalty. 484 U.S. at 246, 108 S.Ct. 546 ; see also Jones , 132 F.3d at 249.
Accordingly, Defendant's motion to strike the death penalty notice on this ground fails. Seeking the death penalty here, with a statutory aggravating factor that genuinely narrows the class of death-eligible people, does not violate the Eighth Amendment. So the motion is denied.
F. Motion to Preclude the Death Penalty Because the Government's Arbitrary Use of the Death Penalty Under the Federal Death Penalty Act is Unconstitutional
Now, adopting the kitchen sink approach, Defendant seeks to preclude the imposition of the death penalty on Fifth and Eighth Amendment grounds. (Doc. 303.) Relying heavily on an opinion from Judge Crawford in the capital case United States v. Fell , Justice Breyer's dissent in Glossip v. Gross , and various studies, Defendant levels a fusillade of arguments that, as the Government's opposition points out, have all been previously rejected. (See id. ; Doc. 324.) On review, they fare no better here.
First, Defendant again claims that FDPA is arbitrary because it does not genuinely narrow the set of defendants eligible for the death penalty, i.e. the constitutionally required narrowing function. (Doc. 303, pp. 4-6.) But as the Court just analyzed, the statutory aggravating factor charged here is constitutional. See supra *1202 Part II.E. And adding the two non-statutory aggravating factors charged-victim impact and a pattern of domestic abuse-further narrows the jury's discretion in imposing the death penalty, thus ensuring the requisite "individualized determination." See Zant , 462 U.S. at 878, 103 S.Ct. 2733. What is more, by requiring a jury to find a gateway intent factor and statutory aggravating factor and then weigh the aggravating factors against mitigating circumstances, the FDPA follows a constitutional sentencing scheme. See Jones , 527 U.S. at 381, 119 S.Ct. 2090. So this argument lacks merit.
Next, Defendant claims that geographic disparity, the white female victim effect, infrequency of capital prosecution for felony murder, the lack of aggravated circumstances, defense counsel funding discrepancies, the jury death-qualification process, the lack of clarity in jury instructions, and the Department of Justice's ("DOJ ") administration of the death penalty all render the imposition of the death penalty here unconstitutional. (Doc. 303, pp 6-19.) As support, Defendant relies on statistics, summaries of other capital cases, various studies, and the United States Attorneys' Manual protocol for capital cases. (See id. ) And again, Defendant strikes out in the face of settled precedent.
For starters, Defendant's cited evidence does not overcome McCleskey , as Defendant still points to general statistical disparities without application to his circumstances. See supra Part II.D. (discussing McCleskey ). Beyond this, not to sound like a broken record, but because the FDPA embodies a constitutional sentencing scheme, differences in outcomes and its administration do not render it arbitrary. See supra Parts II.D, E. Last, Defendant's jury-based arguments ignore Supreme Court precedent that requires "juror[s] who in no case would vote for capital punishment ... [to] be removed for cause" and presumes that "jurors follow their instructions." Morgan v. Illinois , 504 U.S. 719, 728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) ; Richardson v. Marsh , 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) ; see also Boyde v. California , 494 U.S. 370, 380-82, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). So this Court, like others, finds meritless Defendant's arguments. See United States v. Roof , 225 F.Supp.3d 413, 415 n.2 (collecting federal capital cases rejecting similar arguments). Accordingly, this motion is denied.
G. Motion to Dismiss Indictment and to Declare the U.S. Middle District Jury Plan Unconstitutional
Defendant's closing constitutional challenge centers on this district's jury selection process, which he contends abridges the fair-cross section requirement of the Sixth Amendment and the Jury Selection and Service Act ("JSSA ") by systematically underrepresenting African Americans and Hispanics. (Doc. 363, p. 6, 9-23.) Binding Eleventh Circuit precedent says otherwise.
To establish a prima facie violation of the fair cross-section requirement, both constitutional and statutory, a defendant must show: (1) the excluded group is "distinctive" in the community; (2) the representation of this group in venires is not fair and reasonable in relation to its numbers in the community; and (3) this underrepresentation is due to the systematic exclusion of the group in the jury selection process. United States v. Pepe , 747 F.2d 632, 648 n.1, 649 (11th Cir. 1984) (citing Duren v. Missouri , 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) ). "If a defendant fails to establish any of these elements he has failed to establish a prima *1203 facie violation of the sixth amendment." Id. at 649.
Here, Defendant cannot get past the second element. The "relevant comparison" is the difference between the percentage of the "distinctive group" in the population eligible for jury service and the percentage of the group in the qualified jury wheel. Id. (citation omitted); see also United States v. Carmichael , 560 F.3d 1270, 1280 (11th Cir. 2009). "Under Eleventh Circuit precedent, '[i]f the absolute disparity between these two percentages is ten percent or less, the second element is not satisfied.' " United States v. Davis , 854 F.3d 1276, 1295 (11th Cir. 2017) (alteration in original) (quoting Carmichael , 560 F.3d at 1280 ). Such is the case here, where the absolute disparity for each year in question is less than ten percent, as Defendant concedes. (See Doc. 363, pp. 13-14; Doc. S-363, pp. 14-15 (the absolute disparity in 2013 for Hispanics is 7.2%, 5.4% for African Americans; in 2015, 8.1% for Hispanics, 5.4% for African Americans; in 2017, 7.4% for Hispanics, 5.2% for African Americans).) Nevertheless, Defendant urges the Court to adopt an alternative approach in analyzing the second element: comparative disparity. (Doc. 363, pp. 9-15; see also Doc. S-363, pp. 13-15.) But the Court cannot willy-nilly disregard binding precedent that mandates a showing of absolute disparity greater than ten percent for this claim to proceed. See Davis , 854 F.3d at 1295. So because Defendant cannot meet his burden on the second element, his fair cross-section challenge fails.[10] Id. ; see also United States v. Pritt , 458 F. App'x 795, 797-98 (11th Cir. 2012) ; Carmichael , 560 F.3d at 1280-81. This motion is denied.
H. Motion to Trifurcate Proceedings
The final defense motion seeks to trifurcate the trial into three phases: (1) merits; (2) eligibility; and (3) selection. (Doc. 245, pp. 1-2.) First, the merits phase would determine Defendant's guilt of the crimes charged. (Id. at 1.) If Defendant is found guilty of Count One, kidnapping, the jury would then determine in the eligibility phase whether he is eligible for the death penalty, considering his mental state and the existence of the felony murder statutory aggravating factor. (Id. at 2.) Last the jury in the selection phase would consider the appropriate penalty to recommend, weighing evidence related to the non-statutory aggravating factors of victim impact and pattern of domestic abuse against Defendant's mitigating factors. (Id. at 3.)
Defendant contends trifurcation is appropriate to ensure the jury's eligibility determination is not prejudiced by powerful victim impact and domestic abuse testimony, and because it will conserve judicial resources. (Id. ) In response, the Government argues that: (1) trifurcation is not statutorily or constitutionally required; (2) Defendant's concerns of spillover prejudice from victim impact or pattern of domestic abuse testimony are unfounded and can be addressed by carefully crafted jury instructions; and (3) trifurcation unduly burdens everyone involved in the case and causes jury confusion. (See Doc. 267.) In reply, Defendant delved into cases the Government relied on to support its position, distinguishing them. (Doc. 276.) On review, the Court agrees with Defendant.
The FDPA requires splitting a capital case between the merits and sentencing. 18 U.S.C. § 3593(b). As noted earlier, *1204 the FDPA relaxes the evidentiary standards in the sentencing phase. § 3593(c). At sentencing, the jury decides death eligibility and whether death should be imposed. See § 3591(a) (setting forth requirements for sentence of death); § 3592 (outlining statutory mitigating and aggravating factors); § 3593 (procedural requirements). Different evidence is offered for each finding: eligibility focuses on Defendant's mental state and proving at least one statutory aggravating factor, while selection considers additional non-statutory aggravating factors and mitigating factors. See United States v. Fell , 531 F.3d 197, 239 (2d Cir. 2008). Such evidence may include testimony on victim impact and character that "can sometimes be unduly prejudicial, inflammatory, or irrelevant to guilt" but is "constitutionally required for sentencing." Id. So the jury "often decides death eligibility after it hears 'selection' evidence." Id. "This approach may prejudice juror deliberations." Id. Enter trifurcation.
"A trifurcated proceeding allows a district court not only to avoid the admission of prejudicial evidence before the eligibility decision, but also to delineate clearly between the applications of the Confrontation Clause in the eligibility and selection phases." Id. (citation omitted). When this option is presented, a district court should "carefully consider the ramifications of presenting victim impact evidence, or any evidence that would otherwise be inadmissible in the guilt phase of a criminal trial, to a jury that has not yet made findings concerning death eligibility." Id. at 240 n.28. Yet trifurcation is not a one-size-fits-all solution-it may not be appropriate where "penalty phase evidence ... may be relevant to both statutory and non-statutory aggravating factors." United States v. Bolden , 545 F.3d 609, 619 (8th Cir. 2008). "In such cases, the risk of improper spillover will be negligible if the jury is properly instructed and is in any event outweighed by the risk of unnecessary protraction and confusion." Id.
Here, the Notice charges Defendant with one statutory aggravating factor-that the death occurred during the commission of the kidnapping. (See Doc. 230.) So beyond the gateway mental state factors, the Government must prove this factor's existence for Defendant to be eligible for the death penalty. See 18 U.S.C. § 3591(a). Establishing both factors neither requires nor allows for the introduction of victim impact or pattern of domestic abuse evidence, i.e. , the non-statutory aggravating factors charged. See, e.g., United States v. Johnson , 362 F.Supp.2d 1043, 1105-07 (N.D. Iowa 2005) (finding no probative value to "considering information concerning 'non-statutory' aggravating factors to a jury's determination of 'gateway' and 'statutory' aggravating factors"); (see Doc. 230). Indeed, this eligibility inquiry is "entirely severable factually from the jury's consideration of any other factors." Johnson , 362 F.Supp.2d at 1106. So the question then becomes why not trifurcate?
According to the Government, trifurcation is not necessary because any risk of "spillover prejudice" from victim impact evidence or pattern of domestic abuse evidence-which it "no doubt" recognizes "may be emotional and powerful"-can be addressed "by carefully worded jury instructions." (Doc. 267, p. 6.) For this, it relies on Bolden , where the Eighth Circuit found no abuse of discretion in the district court's denial of a motion to bifurcate the penalty phase premised not on the risk of prejudice from victim impact testimony, but on the risk presented by introducing the defendant's criminal history. See 545 F.3d at 618. Only on appeal did the defendant claim two sentencing phases were necessary based on the risk of victim impact *1205 testimony prejudicing the jury's eligibility determination. Id. at 618-19. But because the district court instructed the jury on how to consider victim impact testimony and the record didn't indicate the jury deviated from these instructions, the Eighth Circuit found no abuse of discretion in denying the motion to bifurcate the penalty phase. Id. at 619. So given that procedural posture, Bolden is not helpful here where Defendant is arguing in a pre-trial motion that trifurcation is necessary given the potential prejudice of offering victim impact testimony before eligibility is determined. (See Doc. 245.)
At this juncture, decently apprised of the type of evidence the Government would put on for victim impact and pattern of domestic abuse factors, the Court is absolutely persuaded of its prejudicial import. And hearing this evidence before deciding whether Defendant is eligible for the death penalty carries a high, if not insurmountable, risk that it will unfairly skew that finding. See, e.g., Johnson , 362 F.Supp.2d at 1107. Jury instructions may and likely will effectively curb this, but trifurcation portends certainty. So the Court will go with the sure thing-separating the eligibility determination into a distinct phase. To the Government, this veers the ship off course because trifurcation entails additional proceedings. (Doc. 267, pp. 8-9.) But the risk of unfair prejudice in a single sentencing proceeding dwarfs any resulting practical complications from trifurcation. What is more, the Court entrusts the parties will work together to calm the waters. Therefore, Defendant's motion to trifurcate the proceedings is granted.
Having disposed of Defendant's pre-trial motions, the Court turns to the Government's.
III. Government Motions
A. Motion to Preclude Comparative Proportionality Evidence and Arguments
First up is the Government's penalty phase motion in limine to preclude comparative proportionality evidence and arguments (Doc. 256), to which Defendant filed an initial response (Doc. 271). The Government seeks exclusion of evidence or argument by Defendant comparing the facts of this case to "any other case, particularly similarly situated cases in which a sentence of death was not imposed." (Doc. 256, p. 1.) Such evidence is not constitutionally required, and the Government contends comparing this case to others is not relevant to Defendant's presentation of mitigating factors. (Id. at 2-3.) Moreover, the Government argues that the probative value of such evidence is outweighed by its potential for confusing the issues here and misleading the jury. (Id. at 3-5.)
In response, Defendant notes that his preliminary analysis of comparative proportionality reveals this case is in a world of its own. (Doc. 271, pp. 1-5.) Based on this, any evidence Defendant might present diverges from comparative proportionality evidence historically sought to be admitted and rejected on a probative value assessment-what the Government cites. (Id. at 5-13.) Plus, Defendant does not know yet what proportionality evidence he might seek to admit, so he ultimately asserts that this motion is premature. (Id. at 12-13.) When the time comes that Defendant's comparative proportionality assessment is complete, he asks the Court to then balance its probative value against the risk of unfair prejudice. (Id. )
On review, the Court agrees with Defendant. At this point, neither party knows what, if any, comparative proportionality evidence Defendant may seek to admit. So any present attempt to assess its admissibility *1206 would be going in blind. Should Defendant's comparative proportionality investigation unearth relevant and probative evidence that he seeks to offer in the penalty phase, and the Government objects, the Court will then assess its admissibility. But not now. Hence, the Court denies this motion without prejudice.
B. Motion to Preclude Execution Impact Evidence
At bat now is the Government's penalty phase motion in limine to preclude execution impact evidence (Doc. 257), which Defendant opposes (Doc. 265). Acknowledging a capital defendant's right to present any relevant mitigating evidence in the penalty phase, the Government submits that this does not extend to evidence on the impact Defendant's execution would have on those who love him. (Doc. 257, pp. 5-10.) Specifically, the Government seeks to exclude testimony from Defendant's family and friends regarding their love for him, the impact his death would have on them, their personal views on the death penalty, what they consider an appropriate sentence, or general pleas for sympathy or mercy. (Id. at 4-5.) Testimony of this nature, the Government contends, falls outside the scope of relevant mitigating evidence and improperly spotlights the impact of a death sentence on third parties. (Id. at 5-10.) Furthermore, the Government notes that execution-impact testimony is not required and has been excluded on these grounds before. (See id. at 2-9.)
But the issue is not quite so clear cut. As Defendant points out, many courts have permitted some form of execution impact testimony as relevant mitigating evidence. (See Doc. 265, pp. 2-7 (collecting capital cases); pp. 7-9 (state cases).) Certainly, the Government is correct that some courts have adopted a categorical exclusion approach. See, e.g., United States v. Snarr , 704 F.3d 368, 401-02 (5th Cir. 2013) ; United States v. Taylor , 814 F.3d 340, 369-71 (6th Cir. 2016). But that's not the only "appropriate" option. United States v. Mitchell , 502 F.3d 931, 991 (9th Cir. 2007). A "fine" line can be drawn, where witnesses are permitted to testify "regarding their affection for [the defendant] and their wish for his life to be spared, but ... not allow[ing] them to offer an opinion about what they thought the jury's verdict should be." Id. Such a ruling "ke[eps] the jury focused on relevant mitigating evidence." Id. ; see also, e.g., United States v. Con-Ui , No. 3:13-CR-123, 2017 WL 1410913, at *2-3 (M.D. Penn. Apr. 20, 2017) ; United States v. Williams , 18 F.Supp.3d 1065, 1069-72 (D. Haw. 2014).
Ultimately, the Court finds it appropriate to adopt the nuanced approach. Whether such testimony constitutes relevant mitigating evidence will depend on what Defendant seeks to introduce. See United States v. Hager , 721 F.3d 167, 193-97 (4th Cir. 2013) (analyzing piece-by-piece the admissibility of execution impact evidence proffered). As it stands, Defendant has not indicated what type of execution impact evidence he would introduce, if any. (See Doc. 265.) Rather, both parties seek a blanket admissibility ruling. (See Docs. 257, 265.) Yet the Court will not act uninformed. So, like before, the Court will deny this motion without prejudice and revisit this issue once Defendant knows what execution impact testimony, if any, he seeks to offer.
C. Motion to Preclude Unsworn Allocution by Defendant
Moving along, the Government filed another penalty phase motion in limine to preclude unsworn allocution by Defendant. (Doc. 258.) Its argument is rooted in the absence of a constitutional or *1207 statutory right of allocution and the inapplicability of Federal Rule of Criminal Procedure 32 in capital jury trials. (Id. at 1-5.) The Government also opines that allocution would not constitute admissible mitigating evidence under the FDPA's evidentiary standard and notes that Defendant already has the right to testify during which he could personally address the jury. (Id. at 5-6.)
In response, Defendant objects to a pre-trial ruling on this matter and raises the issue of his competency. (Doc. 272, p. 2.) Then, substantively speaking, Defendant argues that precluding allocution deprives him of a fair jury trial and due process. (Id. at 3-10.)
On review, the Court agrees with Defendant that this issue cannot be decided pre-trial. Rather, in the event of a penalty phase, Defendant's right of allocution must take into account whether he testifies, mitigating evidence, and other factors that simply cannot be assessed at this time. With this, the Court will deny this motion without prejudice. The Government may raise an appropriate objection at trial.
D. Motion in Limine to Admit Statements of Victim Pursuant to Federal Rule of Evidence 803(3)
Last but certainly not least, the Court turns to the Government's motion in limine to admit statements of the victim under Federal Rule of Evidence 803(3). (Doc. 322.) The Government seeks to admit statements R.M. made to family members and others following her alleged escape from Defendant on November 15, 2016. (Id. at 1-3.) The Government maintains these statements are relevant under Federal Rule of Evidence 401 and admissible under Rule 803(3) as an exception to hearsay because they are statements of a declarant's then-existing state of mind. (Id. at 4-6.) In response, Defendant seeks exclusion of these statements as unfairly prejudicial under Rule 403. (Doc. 335, pp. 4-6.) But if these statements are to be admitted, Defendant seeks to limit the testimony to R.M.'s state of mind, without accompanying explanation of why she felt that way, and requests a limiting instruction. (Id. at 1-4.)
On review, the Court will grant the motion in part, limiting testimony to R.M.'s state of mind without any accompanying explanation. Contrary to Defendant's 403 argument, the probative value of these statements is clear: they paint a picture of the circumstances surrounding R.M.'s alleged escape and stint in Florida. And because the Court will limit their content, as explained next, this lessens their prejudicial import. See United States v. King , 713 F.2d 627, 631 (11th Cir. 1983) ("[I]n a criminal trial relevant evidence is inherently prejudicial; it is only when unfair prejudice substantially outweighs probative value that [Rule 403] permits exclusion."). But, as Defendant rightfully points out, the full statements the Government submitted are not admissible under Rule 803(3). See United States v. Samaniego , 345 F.3d 1280, 1282 (11th Cir. 2003). Indeed, "the state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind." Id. (quoting United States v. Cohen , 631 F.2d 1223, 1225 (5th Cir. 1980) ). Rather, 803(3) "narrowly limit[s] those admissible statements to declarations of condition-'I'm scared'-and not belief-'I'm scared because [someone] threatened me.' " Id. (first alteration added, second in original) (quoting Cohen , 631 F.2d at 1225 ). Accordingly, the Court will admit these statements, as provided in the Government's motion:
*1208 • R.M. communicating by telephone with an individual the evening of November 15, 2016 and November 16, 2016 that she was "finally free." (Doc. 322, p. 2.)
• R.M. telling T.N. on or about November 18, 2016 that "she would never go back with the Defendant, and stressed that her relationship with the Defendant was over"; R.M. expressing "a desire to get a divorce and move on with her life; and R.M. stating "she wanted to sell the jewelry the Defendant had given her." (Id. )
• R.M.'s statements between November 18, 2016 and November 27, 2016 of her "desire to move on from the Defendant, reside in Ormond Beach with T.N., and obtain employment." (Id. )
• R.M.'s statements to B.B. that "she was relieved to be away from Defendant"; that she was "worried"; her "plans to obtain restraining orders against the Defendant, as well as taking other measures to hide from the Defendant"; and that she "was positive and upbeat, and stated she had no intentions of reuniting with the Defendant." (Id. at 2-3.)
• R.M.'s statements to C.D. on or about November 24, 2016 that "R.M. was grateful to have her life back" but "was worried"; "she was never going back to the Defendant"; "she wanted her things back from the Defendant"; "had no desire to go back to the Defendant"; and she "cried several times when talking with C.D., and expressed sadness." (Id. at 3.)
All of these statements are declarations of condition or intent or plan, so they are admissible under Rule 803(3). Conversely, these statements are inadmissible:
• R.M.'s statement to T.N. on or about November 18, 2016 that "she believed the Defendant would kill her (R.M.) if he ever saw R.M. not wearing the jewelry he purchased for her." (Id. at 2.)
• R.M.'s reasoning behind her statement to B.B. that she was worried-because "the Defendant would track her down." (Id. )
• R.M.'s reasoning behind her statement of worry to C.D. "that the Defendant would come and find her and hurt her." (Id. at 3.)
• R.M.'s reasoning behind crying and expressing sadness to C.D. that "she had missed so many birthdays of family members and other important events while with the Defendant." (Id. )
• C.D. asking R.M. "why she came to Florida, given that the Defendant knew she had escaped with T.N. and could track her to Florida" and R.M's response that "it did not matter where she went, that the Defendant would find her anyway." (Id. at 3.)
• Any explanation behind R.M.'s statements between November 18, 2016 and November 27, 2016 where she expressed a desire to move on from the Defendant, reside in Ormond Beach with T.N., and obtain employment. (See id. at 2.)
• Any explanation for when R.M. contacted B.B. in Ormond Beach and stated she "was relieved to be away from the Defendant." (See id. )
As such, the admissible statements are narrowly limited to R.M.'s present state of *1209 mind, not why she held that state of mind. See Samaniego , 345 F.3d at 1282. So the motion is granted in part and denied in part.
CONCLUSION
Accordingly, it is ORDERED AND ADJUDGED as follows:
1. Defendant's Motion to Declare 18 U.S.C. § 1201(a) Unconstitutional and to Strike the Capital Punishment Notice (Doc. 290) is DENIED .
2. Defendant's Motion to Strike Doc. 230 (Notice of Intent to Seek the Death Penalty) Because the Federal Death Penalty Act Violates the Tenth Amendment to the United States Constitution (Doc. 300) is DENIED .
3. Defendant's Motion for Order Striking Death Penalty Notice as Offending "Evolving Standards of Decency," Based Upon Defendant's Irreversible Serious Mental Illness and Substantial Brain Damage (Doc. 301) is DENIED .
4. Defendant's Motion to Strike Death Penalty Notice Based Upon Influence of Arbitrary Factor-Race and Gender of Victim (Doc. 264) is DENIED.
5. Defendant's Motion to Strike Notice of Intent to Seek Death Due to Evolving Standards of Decency that Preclude a Death Penalty Based Solely on the Felony-Murder Aggravating Factor (Doc. 254) is DENIED .
6. Defendant's Opposed Motion to Preclude the Death Penalty Because the Government's Arbitrary Use of the Death Penalty Under the Federal Death Penalty Act Is Unconstitutional (Doc. 303) is DENIED .
7. Defendant's Motion to Dismiss Indictment and to Declare the U.S. Middle District Jury Plan Unconstitutional (Doc. 363) is DENIED .
8. Defendant's Motion to Trifurcate Proceedings (Doc. 245) is GRANTED .
9. The United States' Penalty Phase Motion in Limine to Preclude Comparative Proportionality Evidence and Arguments and Incorporated Memorandum (Doc. 256) is DENIED WITHOUT PREJUDICE .
10. The United States' Penalty Phase Motion in Limine to Preclude Execution Impact Evidence and Incorporated Memorandum (Doc. 257) is DENIED WITHOUT PREJUDICE .
11. The United States' Penalty Phase Motion in Limine to Preclude Unsworn Allocution by the Defendant and Incorporated Memorandum (Doc. 258) is DENIED WITHOUT PREJUDICE .
12. The United States' Motion in Limine to Admit Statements of Victim Pursuant to Fed. R. Evid. 803(3) is GRANTED IN PART AND DENIED IN PART to the extent identified in this Order.
DONE AND ORDERED in Chambers in Orlando, Florida, on October 10, 2018.

The Court has announced its intent to hold a hearing on Defendant's motion to exclude pattern of domestic abuse evidence in the penalty phase (Doc. 223), pending resolution of Defendant's second competency determination. (See Docs. 237, 353).

Given the procedural posture of this motion, the Court recites the facts as set forth in the Government's brief (Doc. 304) and the Criminal Complaint (Doc. 1).

Defendant maintains that § 1201(a) also violates the Sixth Amendment, but he cites no authority challenging § 1201(a) under the constitutional guarantees of the Sixth Amendment. (See Doc. 290.). (See Doc. 290, pp. 1, 2-3.) The Court construes the motion accordingly.

While unpublished opinions are not binding precedent, they may be considered as persuasive authority. See 11th Cir. R. 36-2 ; see also United States v. Almedina , 686 F.3d 1312, 1316 n.1 (11th Cir. 2012).

The decisions of the former Fifth Circuit rendered before October 1, 1981 are binding on the Eleventh Circuit. Bonner v. City of Prichard , 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

Indeed, the authority Defendant summoned overturned the kidnapping convictions based on insufficient evidence, not on constitutional grounds. (See Doc. 290, pp. 6-7.)

Admittedly, the standard for facial challenges has been the source of heated debate in the Supreme Court. See United States v. Frandsen , 212 F.3d 1231, 1235 n.3 (11th Cir. 2000) (explaining the debate). But the latest decision appears to bring closure by not requiring a defendant to show "no set of circumstances" to prevail on a facial vagueness challenge. See Johnson , 135 S.Ct. at 2561 ("[O]ur holdings contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."). Yet the Eleventh Circuit in two post-Johnson opinions has applied varying facial vagueness standards. Compare Caldwell , 655 F. App'x at 732 (applying Johnson's narrower standard) with United States v. Ruggiero , 791 F.3d 1281, 1285-86 (11th Cir. 2015) (continuing to employ Salerno's "no set of circumstances" standard).

At that start of this motion, Defendant states he is relying on the Fifth, Sixth, and Eighth Amendments, but then refers only to the Eighth Amendment throughout the motion, save for one sentence at the end where he invokes the Equal Protection Clause of the Fourteenth Amendment. (See Doc. 301.) Thus, the Court construes this motion as an Eighth Amendment challenge alone.

Again, this motion blanketly asserts that the Fifth, Sixth, and Eighth Amendments are violated without elaboration. (See Doc. 264, pp. 1, 2, 21.) On review, the Court construes the motion as raising a Fifth Amendment equal protection challenge and an Eighth Amendment arbitrary challenge, which Defendant substantively argued. (See id. at 16-20.)

As Defendant recognizes, because he cannot overcome the second element with the absolute disparity test, the Court need not address his arguments on the third element regarding systematic exclusion. (See Doc. 353, pp. 15-16; see generally id. at 15-23); Pepe , 747 F.2d at 649.